## 2661. GRAND LODGE KNIGHTS OF PYTHIAS *v.* BARNARD.

1. While the testimony of a person that another was his or her wife or husband, as the case may be, is competent, and sufficient to establish the marriage where there is no conflict of marriages (*Southern Railway Co.* v. *Brown*, 126 *Ga.* 1, 54 S. E. 911; *Sellers* v. *Page*, 127 *Ga.* 633, 56 S. E. 1011), still, where the issue on trial involves a competition between marriages, and one of the alleged wives shows a valid formal marriage in fact to an alleged deceased husband, and as to the other alleged wife there is no testimony except a general statement that she was married to him at a time previous to the date on which the marriage in fact with the other alleged wife took place, the testimony is insufficient to invalidate the formal marriage. *Norman* v. *Goode*, 113 *Ga.* 121 (38 S. E. 317). In this case the evidence was sufficient to authorize the jury to find that the plaintiff was the lawful wife of the decedent.

2. Where a man has been married to a woman who has gone away and has not been heard of for more than seven years and is presumed to be dead, and he has, after the expiration of the seven years, contracted marriage with another woman, the relationship between him and the second woman is not that of concubinage, even though it develops that the first wife was not in fact dead. Until the fact that the first wife is still alive becomes known to the parties and some steps are taken to annul the second marriage, the marriage state between the man and the second wife is not an unlawful relationship, and the parties thereto have a status which confers rights recognized by law. *Eubanks* v. *Banks*, 34 *Ga.* 407. In many senses the second wife is to be regarded as a wife.

3. Unless the constitution and laws of a fraternal benefit association place a limitation upon those who may be beneficiaries under its policies, or unless the policy itself contains some limitation as to the beneficiaries, the insured may designate as the beneficiary whomsoever he pleases.

4. Even in a fraternal benefit association which insures its members only in behalf of their wives, children, or other near relatives, a member may, unless expressly forbidden, procure a policy or certificate payable to a woman whom he expects to marry, and may designate her in the

policy as his wife, and, if the contemplated marriage does in fact take place before his death, the association will not be allowed to assert that the policy is invalid because the beneficiary was not at the time of the issuance of the policy one of the class of persons capable of being designated as beneficiary.

5. Where a fraternal relief association which insures its members only for the benefit of their wives, children, heirs, and other similar relations accepts the dues or assessments upon a policy or certificate issued to one of its members and payable to a named person as his wife, and he and she are at the time of his death living together as husband and wife and in the honest belief that they are lawfully married, the policy is not void, but upon his death is payable to the designated beneficiary, notwithstanding the fact that at the time he contracted the marriage with the beneficiary there existed between him and another woman an undissolved marriage, which, however, he believed had been terminated by death, by reason of the fact that the woman whom he had previously married had gone away, and had not been heard of for more than seven years. The word "wife," as used in the policy to describe the woman thus living with him as his wife, may properly be used to denominate the relationship. For all the purposes of the policy, and within the spirit of the plan of insurance in question, she was his "wife."

6. While there is a difference in many particulars between insurance or protection as afforded by fraternal beneficial societies or associations and the business of insurance as carried on by corporations organized solely for the purpose of conducting that business, still, even as to fraternal associations, when there is no evidence that the by-laws restrict the beneficiaries to a particular class of persons, and where nothing in the contract evidences a restriction of the right of the insured to name a beneficiary, he may for himself and in his own behalf take a policy or certificate of insurance, and make any one his beneficiary.

DECIDED, FEBRUARY 25, 1911.

Action on policy; from city court of Savannah—Judge Davis Freeman. May 2, 1910.

*F. B. Pettie, Cann, Barrow & McIntire,* for plaintiff in error.

*George W. Owens,* contra.

RUSSELL, J.   Rosa Barnard brought suit upon a policy of insurance for an endowment of $350. Upon the trial the jury returned a verdict in her favor for that amount and for damages and attorney's fees. The defendant made a motion for a new trial, which the trial judge overruled, though he required the damages and attorney's fees to be written off by the plaintiff. The policy or endowment certificate upon which the plaintiff predicated her right to recover was as follows:

"No. 9,729.                                          $350.00.

· "Knights of Pythias, Georgia.   Endowment Policy."

"This policy witnesseth, that the Grand Lodge Knights of Pythias of Georgia, under the jurisdiction of the Supreme Lodge Knights of Pythias of N. and S. A., E., A., A., and A., upon faith of the representation made by brother J. H. Barnard in his application and the medical certificate for membership into said order, which said application and medical certificate are hereby referred to and expressly made a part of this agreement, and under the following expressed conditions, stipulations and agreements now existing or that may hereafter be enacted by the Grand Lodge, will pay to Rosa B. Barnard, wife, heirs or legal representatives of such heir or heirs, at the death of brother knight J. H. Barnard, a member in good standing in Progressive Lodge No. 97 located at Savannah, Georgia, an endowment of not less than $50, nor more than $350, being the total amount due under this policy; provided that the said brother knight J. H. Barnard shall have complied with all the laws and regulations of the grand and subordinate lodges and the conditions hereinafter expressed, viz.:

"First. That the said brother knight shall be a member in good standing in his lodge at the time of his death, and the records of the endowment bureau shall sustain the same.

"Second. That this policy shall not be assigned, transferred, nor hypothecated to any person, persons, or interests before the death of the said brother knight.

"Third. That this policy shall not be assigned, transferred nor hypothecated after the death of the said brother knight, by his widow, heirs, or legal representatives of such heir or heirs, without the consent of the Grand Lodge.

"Fourth. That [if] this policy shall have been assigned, transferred or hypothecated by the said brother knight prior to his death, or by his widow, heirs, or legal representatives of such heir or heirs after the death of the said brother knight, without the consent of the Grand Lodge, then this policy shall become void, and all the rights and benefits arising from the same shall cease and terminate forever.

"Fifth. Any person obtaining admission in the order by false statement, concealment, or evasion of facts regarding personal or family history or present condition of health, forfeits all benefits herein provided.

"Sixth. Any person living in a state of concubinage shall not

be entitled to any of the benefits herein mentioned, and under no condition whatever shall any benefits herein be paid on any claim or to any claimants arising under these sections to any members laboring under the disabilities aforesaid.

"Seventh. That upon the faithful compliance with the foregoing stipulations and laws of the endowment bureau and subordinate lodge, and upon the satisfactory proof of the death of the said brother knight, the endowment bureau will pay, as above expressed, according to the following tabulated statement, an endowment not less than fifty dollars nor more than three hundred and fifty dollars, viz.: First year membership, $50.00; second year, $100.00; third year, $150.00; fourth year, $200.00; fifth year, $250.00; sixth year, $300.00; after six years, $350.00.

"In witness whereof, the Grand Lodge of Georgia has caused its seal to be affixed and this to be signed by its Grand Chancellor at Macon, this the fifth day of May, A. D. 1903, and the Pythian period the X. C. D. Creswill, Grand Chancellor. [Seal.] Attest: F. M. Cohen, G. S. and T. of Endowment. B. W. Warren, G. K. of R. & S."

The defendant demurred to the petition generally, and also upon the ground that the facts alleged in the petition did not entitle the plaintiff to recover damages and attorney's fees. We think that the court correctly overruled the general demurrer; and it is not necessary to consider the special demurrer, since the court required the plaintiff to write off her recovery for these items.

In the court below the defendant denied liability upon the following grounds: (1) It denied that the plaintiff was a beneficiary of the policy. (2) It denied that the representations upon which the policy was obtained were truthfully and faithfully made at the time that the policy was issued, and denied that Barnard had continued faithfully to comply with the stipulations and laws of the endowment bureau and subordinate lodge. (3) It denied that Barnard was at the time of his death a member in good standing in the order, or of Progressive Lodge No. 97, of which he had been a member. (4) It denied that the proofs of the death of Barnard conformed to the requirements of the endowment bureau and the subordinate lodge. (5) It denied that its refusal to pay the amount under the policy was in bad faith. By way of an affirmative defense the defendant set up that the plaintiff had three marriage certificates

issued to him, to wit, on July 28, 1897, a certificate to marry one Ella Coleman; on October 5, 1903, a certificate to marry one Nancy Hilliard; and on January 28, 1909, a certificate to marry one Rosa B. Collins; and that upon the face of these certificates ceremonies were performed on July 28, 1897, October 5, 1903, and January 28, 1909, respectively; "that of the three named persons the said Nancy Hilliard departed this life; that at the time the third certificate was issued upon which the ceremony of marriage was performed with petitioner, Rosa B. Barnard, the said Ella Barnard was then living, and is now in life, and no divorce had been obtained; that the said marriage contract entered into between the said Ella Barnard and J. H. Barnard was still existing, and that the said Ella Barnard was and is the lawful wife of the said J. H. Barnard, and that as a consequence, the attempted marriage of the said J. H. Barnard with Rosa B. Barnard was and is void, and the said Rosa B. Barnard was never in fact lawfully married to the said J. H. Barnard, nor has she ever been his wife, nor is she now his widow; that at the time the marriage ceremony was performed these facts were known to her." The defendant also pleaded that by reason of the facts just stated Rosa Barnard was living in a state of concubinage with J. H. Barnard, and, by reason thereof, no benefits could be paid to her as a claimant under the policy, and that as a consequence of his immorality J. H. Barnard was never a member in good standing, and the policy was void, and no sum was due thereunder.

Upon the trial the issues were narrowed to one leading issue of fact: Who had the superior right to be considered the wife of the deceased? Really no point can be made to the effect that the evidence is insufficient to show that Barnard was in good standing, in the general acceptation of the term, as a member of Progressive Lodge No. 97, and that he had paid all dues and assessments. The proofs of death were made in substantial compliance with the requirements of the order, and it was proved that the plaintiff was married under the formalities of law to the deceased. Whether the proof that Barnard's second marriage is sufficient or not is immaterial, because Barnard married the plaintiff after Nancy, his alleged second wife, had died. As to the first marriage: We think there is sufficient evidence to authorize the jury to find that James H. Barnard at the time that he married the plaintiff was authorized to presume that his first wife was dead, and there is no evidence

that the plaintiff knew or had heard of any marriage to the alleged
first wife when she married him.   While the evidence upon this
point is in conflict, the jury were fully authorized to find that the
first wife had been absent from the city of Savannah and the State
of Georgia for more than seven years; and all the circumstances
indicated that the deceased had never heard of or from her during
that time.   The defendant did not introduce in proof the marriage
licenses referred to in its plea, or submit any proof that the mar-
riage ceremony was in fact performed between the deceased and
either of the first two women he was alleged to have married.   Upon
this see *Norman* v. *Goode,* 113 *Ga.* 121 (38 S. E. 317).

Granting that the plaintiff is shown to have been the wife of the
deceased, we come to the point which raises for consideration the
only real question in the case.   The plaintiff admitted upon the
stand that she did not marry the deceased until January, 1909.
This was nearly six years after the policy or endowment certificate
was issued.   Clearly, then, at the time it was issued, the plaintiff
was not the wife of the insured.   It is upon this fact that the argu-
ment that Barnard was living in a state   of   concubinage   most
strongly depends.   Indeed, there is no evidence that Barnard had
avoided the contract by living in a state of concubinage, unless it
can be inferred from the fact that he made this certificate of in-
surance payable to her six years before he married her, and con-
tinued to pay the dues necessary to keep it in force for her benefit
even during the life of his second wife.   It is to be doubted, under
the ruling in *Norman* v. *Goode,* supra, and authorities there cited,
that it was proved that Barnard ever was married prior to his
marriage to the plaintiff.   The licenses were never introduced, and
no witness testified to facts going to show that a marriage contract
was actually entered into by Barnard with any other of his alleged
wives.   The mere fact that Barnard took out a policy of insurance
or endowment certificate payable to Rosa Barnard when she was not
his wife would hardly authorize the inference that he was at that
time or at any time thereafter sustaining illicit relations towards
her.   The cases are numerous where persons have taken policies of
insurance upon their own application for the benefit of others to
whom they entertain nothing except a platonic affection.   Under
the circumstances of the case as developed by the evidence, it is
just as reasonable to suppose that the deceased intended, at the time

that he took the policy, to marry the plaintiff, and that for some reason the marriage was not consummated, and that the affection was a virtuous one, as to jump to the conclusion that she was his concubine. According to the evidence, she had lived within a short distance of his father's house many years. She never knew his first wife, though she was acquainted with his second wife. She was well esteemed by the father of the deceased, and at the time the policy was issued Barnard's first wife had left him and gone to parts unknown, and he had not married, and, so far as the evidence shows, had not thought of marrying, his second wife, who afterwards died. Whatever may be the facts in regard to this, whether there is any undisclosed romance or not, it would seem that if Barnard had ever lived in a state of concubinage with the plaintiff before he married her,. the fact could have been easily established; but no attempt was made to prove it. Whatever his reason for designating Rosa Barnard as the beneficiary of the endowment certificate, the fact that the deceased did so designate her would not of itself vitiate the policy, in the absence of proof, either direct or circumstantial, of the existence of a relation of concubinage between them. "While à valid contract of insurance can not lawfully be taken on the life of another by one who has no insurable interest therein, because it contravenes public policy, yet, as one has an insurable interest in his own life, he may lawfully procure insurance thereon for the benefit of any other person whose interest he desires to promote. Such a contract can not be defeated because of the want of insurable interest in the beneficiary, when it appears that the person whose life was insured acted for himself, at his own expense and in good faith, to promote the interest of the beneficiary, in taking out the policy. A contract so entered into is in no sense a wagering or speculative one." Union Fraternal League v. Walton, 109 Ga. 1 (34 S. E. 317, 46 L. R. A. 424, 77 Am. St. R. 350).

But, conceding that all three marriages were proved, we think that the verdict rendered was authorized by the law and evidence for at least two reasons: First, because, if Barnard was not guilty of concubinage, the payment of the certificate could not be avoided merely because Rosa Barnard was not his wife at the time the certificate was issued, for it was not material to the risk, and therefore it was immaterial to the contract whether she was his wife or not. In the second place, so far as the beneficiary is concerned, the policy

is not confined to the person who might have been Barnard's wife at the time the endowment certificate was issued, because the beneficiaries are successively distinctly designated in the policy, and the amount due by the terms of the contract is to be paid "to Rosa B. Barnard, wife, heirs or legal representatives of such heir or heirs, at the death of brother knight J. H. Barnard," etc. The statements just made are both dependent on the fact that the jury were authorized to find and did find that Rosa Barnard was in fact the wife of J. H. Barnard at the time of his death, because, unless she was at that time his wife, a finding in her favor would not, for either reason, be authorized. We will therefore first examine the evidence upon this point.

The second marriage of the deceased may be dismissed from consideration, because it is not disputed that the second wife had died before the plaintiff married the insured. Granting it to be established (as counsel for the defendant in error concedes it to be a fact) that Ella Barnard was the first wife of Barnard, it is clearly established by the preponderance of the testimony that she left her husband and went to New York more than eight years before Barnard married the plaintiff, and the circumstances all tend to prove that Barnard had no communication with her nor any information in regard to her or as to her whereabouts from the time she left Savannah. Ella Barnard, it is true, swore that she wrote to him twice and received a reply to her letters, but against this, among several other contradictory circumstances, was the testimony of her father-in-law, who testified, that for some years before the first wife left Savannah she and his son, the husband, were as far apart as the North from the South; also the fact that his son, after his first wife left him, lived in his house, and that he never knew of his receiving any letter from the first wife, and his son never spoke of having heard from her; and the fact that great difficulty was experienced in ascertaining the whereabouts of the first wife when she was wanted as a witness after the death of her former husband. All of these matters were for the jury, and they found that the insured had had no news of his wife for more than seven years. This would have authorized the deceased to marry Rosa Barnard, and, if the marriage was otherwise legal, would have made her for many purposes his lawful wife.

If the plaintiff at the time of the death of the insured was his

lawful wife, then she is entitled to receive the payment stipulated in the contract, whether she was his wife at the time the endowment contract was made or not. If the plaintiff was not Barnard's concubine at the time the policy was applied for, nor at any time thereafter, then, so far as the record goes, no reason is shown or suggested why he should not of his own motion have designated her as his beneficiary. But for the provision in the policy in regard to concubinage the contract would not have been avoided, even if the plaintiff was his concubine, under the ruling in *Equitable Life Assurance Society* v. *Paterson,* 41 *Ga.* 338 (5 Am. R. 535). In that case the beneficiary was the wife of another man, whom both she and Paterson knew to be alive. Paterson in his application for insurance represented the woman with whom he was living in adultery to be his wife. She had apparently no insurable interest in his life, and he died from poison, under circumstances calculated to raise at least a violent suspicion that if she did not administer it, with a view of ending his life, she might have saved his life by calling a physician to administer antidotes; and yet in that case the Supreme Court held, that "when one, as the agent of his reputed wife, represented to an insurance company that she was his wife, and effected an insurance upon his own life in her name, as her agent, for her benefit, and the truth of the case was that the marriage was void by reason of the reputed wife having a former lawful husband living at the time of the second marriage, . . the policy is not void by reason of the illegality of the last marriage, unless it further appears that the said reputed husband and wife knew, at the time the policy was effected, that at the time of their supposed marriage the lawful husband of the wife was living, and the marriage illegal, and failed to inform the company of the fact."

After all, the important fact as to a representation is whether the representation is material, and, so far as the beneficiary is concerned, whether the beneficiary has such a beneficial interest in the life of the assured as would relieve the insurer's risk from hazard resulting from lack of insurable interest. Under our code a contract of insurance is valid where the beneficiary has an insurable interest. Civil Code (1910), § 2496. An insurable interest is not necessarily dependent upon marital relation or kinship by affinity or consanguinity. In a broad sense it may be said that any one has an insurable interest in the life of another where the latter feels sufficient

interest in his welfare, for any reason, either to substantially assist him during his life, or to make him a gift after death, which he perhaps may not be able to do during life. Furthermore, the mere failure to state a material fact, when not done fraudulently, will not avoid a policy of insurance. This principle is plainly stated in *German-American Mutual Life Association* v. *Farley,* 102 *Ga.* 720 (4), (29 S. E. 615). In delivering the opinion in that case Justice Atkinson said: "Whatever may be the rule with respect to that question in other jurisdictions, it is now, by the settled course of judicial opinion in this State, the established law that representations contained in an application for insurance, though incorporated therein and warranted to be true, if they relate to mere immaterial matters, do not avoid a policy of insurance. In reviewing and applying the principle discussed in the case of *Southern Life Insurance Co.* v. *Wilkinson,* 53 *Ga.* 535, this court, through Bleckley, J., in the case of *Mobile Fire Department Insurance Co.* v. *Coleman,* 58 *Ga.* 255, uses the following language, which we here quote for the purpose of showing that there is no such magic in a contract of insurance as to take it out of the ordinary rules which govern the construction of contracts between parties touching other matters: 'So much of this case as turned upon dealing with the subject of materiality, whether of covenant or representation, we think is ruled by 53 *Ga.* 537. The Code governs the contract, and the construction of the Code is settled, to the effect that what is wholly immaterial to the risk is so utterly immaterial that the yea or nay of it will not render the policy void. If this be the true meaning of the Code, even an express stipulation by the parties that the validity of the policy shall depend on immaterial as well as material matters is, at bottom, an attempt to repeal the law. Such a stipulation is itself immaterial in the sense of being idle and nugatory. The Code, instead of relegating to the parties the subject of materiality, holds possession of it for rational and honest adjudication by the tribunals of the country.' " And in the *Farley* case, supra, the Supreme Court held that the court did not err in refusing to charge the jury that if an applicant for insurance, in answer to the question whether he had applied to other insurance companies and had been rejected, and, if so, give the name of each, replied "Yes," giving the name of only one and omitting the other companies, such omission to name the other by which he had been rejected was a concealment, and, if

this concealment affected a matter material to the risk, it would avoid the policy; also that the court did not err in refusing to charge that if, in reply to a question as to what physicians had attended him in the last 10 years, and the names of each, he had given but one physician, when, in fact, he had been attended by several within the time named, then, if such fact was found by the jury to be material to the risk, it would avoid the policy, whether made in good faith or not. In regard to this point Justice Atkinson said: "If the instruction requested correctly stated the law, a policy would be avoided because of a mere omission upon the part of the assured to state a material fact, without reference to the motive by which he was influenced in omitting to make such statement. An omission to state is the equivalent of a failure to state; and by our Civil Code [(1910,) § 2481] it is expressly provided as follows: 'A failure to state a material fact, if not done fraudulently, does not void; but the willful concealment of such a  fact, which would enhance the risk, will void the policy.' . . The omission from the request of the word 'fraudulently' put it in direct opposition to the code provision above referred to; and it was therefore properly refused by the court." Except upon the ground that the manifest purpose of the organization of which the deceased was a member is to elevate morals and maintain good morals, and therefore that no beneficiary will be permitted whose only relation to the assured depends upon a violation of the laws of God and man, it is apparent from the contract itself that there is no special reason why it was material to the defendant association whether Rosa Barnard was or was not his wife, or that it would enhance the risk upon his life if she had otherwise such an interest in his life as we have referred to, and which would be an insurable interest. Barnard made the contract himself, and continued it in existence by his own voluntary payments without the knowledge of Rosa Barnard so far as appears from the record. It is not apparent from the contract in the present instance that there is any requirement that the beneficiary shall be restricted to any certain class of persons (other than those who generally might have an insurable interest in the life of the insured), because provision is made that, if for any reason the payment could not be made to Rosa Barnard as wife of the assured, it would be payable to his heir or the heirs of his heir. And this is in keeping with a well-settled principle. An insurance policy represents a fund held

in trust for the benefit of a beneficiary or beneficiaries, and a trust should never fail for want of a beneficiary should it be possible to find a beneficiary.

This brings us to a second reason on account of which the writer thinks the judgment of the lower court is correct. The policy declares that, if it is not payable to Rosa Barnard, his wife, it shall be payable to his heir. If, therefore, by reason of the fact that Rosa Barnard was not his wife at the time the policy issued, the payment is not required to be made to her as such, she is still entitled to recover the amount of the policy as the heir of Barnard, for the reason that she was at the time of his death his wife, and, so far as appears from the record, his only heir. The majority of the court think that if she was not his lawful wife, she was not his heir.

We are all of the opinion that the verdict was authorized by the evidence, and that the court did not err in refusing a new trial.

The plaintiff in error insists, in the seventh, eighth, and ninth grounds of the motion for new trial, that the Grand Lodge, Knights of Pythias, is not an insurance company, and that no evidence was offered to support the allegation of the petition to that effect, and it also insists, in the ninth ground, that the court erred in charging the jury that, "where there is nothing in the contract to evidence a restriction of the right of the party to name a beneficiary, he, for and on behalf of himself, may take a policy of insurance and may make any one his beneficiary." In this instruction we find no error which could have been harmful to the defendant in the court below. We recognize that there is a difference between a fraternal organization which incidentally insures the lives of its members (while insurance is not the controlling idea of the organization) and those companies which are organized and maintained solely for the purpose of conducting the business of insurance. But while fraternal insurance associations ordinarily restrict both their membership and the right to procure benefit certificates or insurance to certain classes, and while these contracts might be controlled by their constitutions and by-laws, still, as no by-laws were in evidence in this case, we think the court had the right to assume that there was no by-law restricting the beneficiaries to any particular class; and, as the policy or certificate itself did not restrict them, the error was harmless.                    *Judgment affirmed.*