(105 So. 611)

No. 26185.

**GRANT et al. v. SUCCESSION OF GRANT.**

(Oct. 29, 1923. On the Merits, May 25, 1925. Rehearing Denied Oct. 6, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Appeal and error ⚖➔361(2), 384(1)—Not required to state whether it is suspensive or devolutive appeal that is applied for.**

Under Code Prac. arts. 573, 574, and 579, it is not required that either the petition, motion for appeal, or appeal bond shall state whether it is a suspensive or devolutive appeal that is applied for.

2. **Appeal and error ⚖➔458(1)—Character of bond and time within which it is filed determines character of appeal.**

It is the character of bond and the time within which it is filed which determines whether the appeal is a suspensive or devolutive one.

3. **Appeal and error ⚖➔458(1)—Where bond given within time prescribed for taking a suspensive appeal, appeal is a suspensive one.**

Where defendants obtained an order for both a suspensive appeal and a devolutive appeal, bond in each case being fixed at $5,000, and the bond was given within two days after judgment was rendered, *held* the appeal was a suspensive one.

4. **Appeal and error ⚖➔466—Surety on appeal bond of suspensive appeal held unconditionally bound by conditions therein.**

Where bond provided that defendant and appellant should prosecute appeal and satisfy whatever judgment should be rendered against her, or that same should be satisfied by the proceeds of the sale of her estate, real or personal, otherwise that indemnity company should be liable, such stipulations met the conditions of a suspensive appeal bond under Code of Prac. art. 579, as against contention that surety on the appeal bond was not unconditionally bound.

5. **Appeal and error ⚖➔227—Attack on sufficiency of bond as suspensive appeal bond, not urged below, cannot be urged on appeal.**

Where objections to sufficiency of bond as a suspensive appeal bond were not made in lower court after due notice and opportunity given defendant to furnish new bond as required by Act 112, 1916, such objections cannot be urged on appeal.

On the Merits.

6. **Marriage ⚖➔13—Common-law marriages are recognized by law of Mississippi.**

Common-law marriages have always been recognized by the law of Mississippi, with exception of period between adoption of Codes of 1892 and 1902.

7. **Marriage ⚖➔22—Common-law marriage contract must be followed by cohabitation as husband and wife, public and notorious in the community.**

Where marriage by private agreement is recognized, the contract must be followed by cohabitation as husband and wife, public and notorious in the community, in order to establish the marriage.

8. **Marriage ⚖➔50(5)—Petitioner's claim to be common-law wife of deceased held incredible, and evidence failed to show relationship.**

In a succession proceeding, where petitioner filed petition alleging to be common-law wife of deceased, and intervener asserted rights as legitimate son and heir of decedent, *held* that, petitioner's claim of alleged common-law marriage contract with deceased was incredible on its face, and evidence undisputably showed that no matrimonial relations were ever established between petitioner and deceased.

Appeal from Twenty-Sixth Judicial District Court, Parish of St. Tammany; Prentiss B. Carter, Judge.

Petition by Mrs. Mollie T. Grant against the succession of James D. Grant, in which James D. Grant, Jr., intervened. From a judgment recognizing the petitioner as widow in community and intervener as forced heir, Mabel Browne Grant, as defendant, appeals. Motion to dismiss appeal overruled, and judgment appealed from annulled, and judgment entered in favor of defendant and against petitioner and intervener.

J. Blanc Monroe and Monte M. Lemann, both of New Orleans (L. V. Cooley, Jr., of Slidell, Mooney & Foster, of New Orleans, John B. Brunini, of Vicksburg, Miss., and Monroe & Lemann, of New Orleans, of counsel), for appellant Mrs. James D. Grant.

Edward Rightor, of New Orleans, and J. Morgan Stevens, of Jackson, Miss. (Paul W. Maloney and C. H. Osterberger, both of New Orleans, J. Vol Brock, of Franklinton, Harvey E. Ellis, of Covington, and J. C. Cappel, of Alexandria, of counsel), for appellees.

By Division B, composed of Justices DAWKINS, LAND and LECHE.

On Motion to Dismiss Appeal.

LAND, J. Plaintiffs move to dismiss the appeal in this case for the following reasons:

(1) That it does not appear in the record herein whether defendant and appellant intended to or did attempt to perfect her suspensive or devolutive appeal or both, and it cannot be decided by this court whether this case is before this court now on suspensive or devolutive appeal.

On June 14, 1923, defendant and appellant moved for an appeal herein, and the lower court on said day granted defendant and appellant a suspensive appeal upon defendant furnishing bond in the sum of $5,000, and also ordered that defendant and appellant be granted a devolutive appeal upon defendant furnishing bond in the sum of $5,000.

On June 16, 1923, defendant and appellant filed an appeal bond in the lower court in the sum of $5,000, conditioned:

"That the above bound Mabel Browne Grant, widow of James D. Grant, shall prosecute said suspensive and/or devolutive appeal, and shall satisfy whatever judgment may be rendered against her, or that the same shall be satisfied by the proceeds of the sale of her estate, real or personal, if she be cast in the appeal; otherwise that the said Globe Indemnity Company shall be liable in her place."

This is a controversy over the disposition of the estate of James D. Grant, deceased, between plaintiffs, Mrs. Mollie T. Sheehan Grant, the alleged "common-law" wife of deceased, and her son, James D. Grant, Jr., and the defendant, Mrs. Mabel Browne Grant, who was married in this state to deceased November 19, 1907, according to the due forms and solemnities of law.

The date of this alleged "common-law marriage" in the state of Mississippi is August 15, 1884, and the date of the birth of James D. Grant, Jr., the alleged issue of said marriage, is January 4, 1886.

James D. Grant died at his domicile in St. Tammany parish April 19, 1921. On April 30, 1921, his last will and testament, in which he named defendant, Mrs. Mabel Browne Grant, as his lawful wife, appointed her as his executrix, and instituted her as his universal legatee, was duly probated. After the payment of debts, his estate was accepted by the universal legatee unconditionally, and on May 28, 1921, she was sent into possession of its effects by order of court.

On April 4, 1922, plaintiff Mrs. Mollie T. Sheehan Grant filed a petition in the succession of James D. Grant, alleging that she was his "common-law" wife, and prayed for judgment setting aside the will, annulling the probation of same, and the order sending defendant, as universal legatee, into possession, and asking that she be recognized as the owner of one half, and as the usu-

fructuary of the other half, of the estate of decedent.

In, October, 1922, James D. Grant, Jr., also filed a petition in said succession, praying that he be recognized as the sole surviving, legitimate son of deceased and his sole legal heir, and entitled to one-half ownership in the community estate of his deceased father, and to the full ownership of his father's separate estate.

These claims of plaintiffs were denied and contested by defendant, Mrs. Mabel Browne Grant, and a judgment was rendered on these issues in open court June 11, 1923, and was afterwards amended, and was signed, as amended, in open court, June 14, 1923.

This judgment fixed the status and rights of all the parties in interest, and maintained and perpetuated the judicial sequestration herein issued until the final termination of this suit.

No money judgment was rendered, nor was any attempt made to make a finding as to how much property had been acquired by decedent before his marriage to defendant and how much had been acquired after his marriage to her.

The petition of neither Mrs. Mollie T. Sheehan Grant nor of James D. Grant, Jr., prays for any money judgment. Nor did said judgment order the delivery of any real estate or other property in dispute into the possession of either plaintiffs or defendant.

In defendant's motion for appeal it is distinctly stated that the property in controversy here as the property of the succession of James D. Grant, deceased, is in the custody of the court under the writ of judicial sequestration herein issued.

[1] Articles 573, 574, and 579 of the Code of Practice do not require that either the petition, motion for appeal, or the appeal bond shall state whether it is a suspensive or a devolutive appeal that is applied for.

[2] It is the character of the bond and the time within which it is filed which determines the character of the appeal.

[3] The bond in this case was given within two days after the judgment was rendered, i. e., within the time prescribed for taking a suspensive appeal.

In the case of State ex rel. Eustis v. Judge, 27 La. Ann. 685, the court said:

"There is no force in the objection of the respondent that appellant in applying for an appeal did not specifically ask for a suspensive appeal. He applied for an appeal, and he gave bond within ten days for an amount sufficient for a suspensive appeal."

In the case of Funke, Adm'r, v. McVay, 21 La. Ann. 192, we said:

"An order for a suspensive and devolutive appeal may be granted by the judge a quo, separately, or both, in one order, and the appellant may in his discretion avail himself of the benefit of either order by giving the required bond within the time prescribed by law."

Defendants obtained an order for both a suspensive appeal and a devolutive appeal; the bond in each case being fixed at $5,000. Tr. 227.

In the case of Bernheim v. Pessou, 143 La. 609, 79 So. 23, it is stated:

"Where both appeals have been asked, the one bond will serve for the suspensive appeal, if filed in time; if not, then, for the devolutive. * * * The one bond being given for costs, and presumably sufficient for that purpose, there could be no use in giving a second bond to cover the same"—citing numerous cases.

In the above-cited case, one of the grounds of the motion to dismiss the appeal was:

"That the lower judge allowed a suspensive appeal on furnishing a bond of $200 and a devolutive appeal on furnishing a bond of $200, but appellant has furnished only one bond for $200, without designating which appeal he intends to perfect."

The court denied the motion to dismiss, saying:

"In the instant case the bond was filed in time, and hence can avail for the suspensive appeal; and it is in the amount fixed by the judge, and hence can avail for the devolutive

appeal. All that is necessary to maintain an appeal is that a bond in the right amount be filed."

We therefore hold that the appeal in this case is suspensive.

[4] (2) That the bond given by appellant should be unconditional as to the obligation of the surety, and that the bond herein given is not so unconditional.

This contention is based upon the proposition that it is impossible to determine whether the -appeal is devolutive or suspensive, and therefore whether the obligation of the surety on the appeal bond herein given is for a devolutive or a suspensive appeal.

The condition of the bond in this case is that defendant and appellant shall prosecute the appeal and shall satisfy whatever judgment may be rendered against her, or that the same shall be satisfied by the proceeds of the sale of her estate, real or personal, if she be cast in the appeal; otherwise that the said Globe Indemnity Company shall be liable in the premises.

Those are the conditions of a suspensive appeal bond. C. P. art. 579.

The appeal in this case being suspensive, the surety on the appeal bond is bound by these conditions, and has so expressly bound itself in said bond.

[5] (3) An attack is made by appellees on the sufficiency of the bond as a suspensive appeal bond.

The contention of appellees that the appeal bond in this case is insufficient in amount or incorrect by reasons of errors or omissions therein should have been made in the lower court after due notice to defendant and appellant, and an opportunity given defendant and appellant to furnish a new bond, as required by Act 112 of 1916.

It is not pretended that appellees pursued this course in the lower court, and it is now too late to urge these objections here. Hurry v. Hurry, 144 La. 877, 81 So. 378; Durel v. Buchanan, 147 La. 804, 86 So. 189; Bil-

ich v. Mathe, 149 La. 484, 89 So. 628; White v. Maison Blanche Co., 142 La. 265, 76 So. 708.

The motion to dismiss the appeal is therefore overruled.

### On the Merits.

ROGERS, J. James D. Grant died at his domicile in the town of Slidell, parish of St. Tammany, on April 19, 1921, leaving an olographic will in which he constituted his wife, Mabel Browne Grant, the present defendant, as his universal legatee, and appointed her executrix of said will.

The succession of the deceased was duly opened, his will probated, and letters of testamentary executorship issued to his said wife. Subsequently, upon her petition, judgment was rendered recognizing petitioner as the widow in community and universal legatee of her said deceased husband, and as such sending her into possession of his estate.

One year, lacking a few days, thereafter, plaintiff, claiming to be the widow of James D. Grant, filed a petition in the succession proceedings, in which she alleged that she was married to the decedent in the city of Vicksburg, in the state of Mississippi, on August 15, 1884, according to the common-law forms of that state, and praying for judgment setting aside the will of the decedent and recognizing her as his widow in community, and as such entitled to the ownership of one half of the estate and the usufruct of the other half.

James D. Grant, Jr., averring himself to be the issue of the alleged common-law marriage, intervened and asked for the recognition of his rights as the legitimate son and heir of the decedent.

The defendant answered, denying all the allegations of both plaintiff and intervener; and, in addition, pleaded an estoppel, based upon the fact that if such common-law mar-

riage was contracted as alleged, the long interval of time elapsing since the alleged marriage, and the continued silence of both plaintiff and her son, with full knowledge of defendant's marriage to the said decedent, acted as a bar to their asserted claims.

The judgment of the court below maintained the claim of a common-law marriage, recognized plaintiff as widow in community, and the intervener, James D. Grant, as the forced heir of his father, but holding that defendant was entitled to recognition as the deceased's putative wife and his testate heir.

Defendant appealed from the judgment; and plaintiff and intervener, after an unsuccessful attempt to dismiss the appeal on a motion filed for that purpose, answered the appeal praying for amendment of the judgment in accordance with their views of what the decree should be.

[6, 7] It is conceded that common-law marriages are now, and, with the exception perhaps of the period between the adoption of the Codes of 1892 and 1902, have been always, recognized by the law of Mississippi; and the law governing such marriages in said state and elsewhere has been exhaustively presented by both sides to this controversy. While the authorities in general are conflicting as to the essentials required for a valid common-law marriage, the weight of authority appears to uphold the doctrine that where marriage by private agreement is recognized at all, the contract must be followed by cohabitation as husband and wife, public and notorious in the community, in order to establish the marriage. This seems to be the rule in Mississippi, as announced in Sims v. Sims, 122 Miss. 745, 85 So. 73, in which the Supreme Court of Mississippi expressly held that mere words of present assent were not sufficient unless followed by cohabitation as husband and wife.

One of appellees' counsel has submitted an elaborate argument, in a specially prepared brief on the law, in which he undertakes to demonstrate that the language of the opinion in Sims v. Sims, referred to supra, to the effect that the agreement must be followed by cohabitation is purely dicta. We do not consider it necessary to analyze this argument, because, admittedly, the fundamental element in a common-law marriage is the agreement of the parties, and we do not find that appellees have established any such agreement.

The evidence shows that about 40 years ago, James D. Grant, the decedent, then a youth in his early 20's, while working for a railroad company in the city of Vicksburg, became acquainted with plaintiff, then a girl about 16 years of age. This acquaintance was due entirely to the efforts used by plaintiff to attract the attention of Mr. Grant, by smiling and "making eyes" at him as he went to and from his work. Plaintiff and her sister lived with their mother, who ran a cheap lodging house, where liquor was dispensed at all hours, in a section of the city occupied by saloons and disreputable houses. The mother was known in Vicksburg as a coarse, vulgar woman, addicted to the use of strong drink and drugs, and for her indulgence in profanity. The girls were generally regarded as the reverse of virtuous.

Some time after the acquaintance between plaintiff and the decedent was formed, they entered into an irregular physical relationship, as the result of which a child was born to plaintiff. Subsequently she gave decedent's name to the child, who is the intervener herein.

The irregular connection between Mr. Grant and the plaintiff ceased within two or three years. In 1887 he went to Texas, where he lived until 1890, when he returned to Vicksburg. In 1895 he removed to New Orleans when the railroad headquarters were transferred to said city.

Plaintiff, after her relations with decedent had ceased, formed an illicit connection with a man named Martin. This connection was notorious in Vicksburg. In 1897 Martin and the plaintiff removed to the city of New Orleans, where their relations continued. At this time, plaintiff assumed the name of Mrs. Mollie T. Grant, and her neighbors thought Martin was her husband.

While Mr. Grant was in Texas, plaintiff gave birth to a second child. When this child was 3 years old she had it baptized, giving it the name of John R. Grant. Decedent denied his paternity of this child, who died of yellow fever in 1897.

In 1906, Mr. Grant married Miss Mabel Browne, the defendant in this suit. They first lived in New Orleans, and then in Slidell, where they were residing at the time of Mr. Grant's death. Although he began life as a poor man, at his death he left a large estate, accumulated, mainly, in his later years.

The only direct proof offered in support of the alleged agreement of marriage is the testimony of the plaintiff herself and of her sister.

Plaintiff testified that the agreement was entered into on the evening of August 15, 1884. How she was able to fix the exact time is not shown. Her story is, however, that Mr. Grant, while visiting her on that evening at her mother's house, where she was living, suddenly pulled out of his pocket a small ring which he placed upon her finger, saying, "This makes you my little girl wife;" and she immediately replied, "Yes." Plaintiff declared that this occurred in a little bedroom immediately in the rear of the room in which her mother's business was carried on; that her sister was present in the room at the time and heard all that was said, but immediately left the room laughing after she had heard the conversation.

Plaintiff's sister, who had testified previously, stated that she was in the room and saw the ring placed upon plaintiff's finger; that all she heard Mr. Grant say was "my little girl wife." She did not hear her sister say anything, and did not understand that she was witnessing a marriage contract. She laughed and left the room, believing that Mr. Grant used the words towards plaintiff because of a marriage ceremony which had already taken place. Mrs. Earp, the sister, made no attempt to fix the exact date of the occurrence.

The bridegroom did not spend the night with his bride, although, according to plaintiff, "something happened" when "things were quiet enough for us." Mr. Grant left the house about 10 o'clock without waiting, either of his own accord or at the request of plaintiff, to see her mother in order to apprise her of the happy event and to receive her congratulations.

Although plaintiff testified that her mother was actually in the house at the time, neither she nor her sister informed her of the alleged marriage. As a matter of fact, plaintiff never at any time told her mother of the incident. It was the sister, according to her testimony, who several days afterwards gave the information to the mother. And the mother on receiving the news "blessed" Mr. Grant out, and declared that "she would break" his "damned neck."

Mrs. Earp, the sister, further testified that her mother's anger was appeased only after she had received a visit from Mr. Murray Smith, a lawyer of Vicksburg, at the instance of Mr. Grant, who told her to keep quiet; that the marriage was "all right in the state of Mississippi."

Both Mr. Grant and Mr. Smith are dead, and the court is without the benefit of their versions of the incidents related by the witnesses. On the other hand, plaintiff has a large pecuniary interest at stake in this suit, and Mrs. Earp is her near relation. Com-

mon experience has taught us the fallibility of such witnesses.

The story of the alleged marriage contract is incredible on its face. It is unbelievable that a youth, hardly more than a boy, a mere railroad employee, such as Mr. Grant was at the time, was cognizable of the law of Mississippi governing common-law marriages. Besides, there was no impelling motive on his part to marry the plaintiff, who had pressed her attentions upon him. Their mutual attraction was merely of an amorous physical nature. The girl was free and easy in her conduct. The blood of youth ran warmly in their veins. Under these conditions, the line between a licit and an illicit relationship was easily obliterated, and the pronouncement of the marriage vows was not a sine qua non to permit unrestrained human nature to have its sway. This sound philosophic truth is phrased by plaintiff herself in these words, viz.:

"* * * When a girl loves a man and the man loves the girl, there is no telling what transpires between them. The attitude of the nature between the two of them brings the two of them together."

Again, the bedroom in which the alleged marriage was said to have occurred was also used as a sitting room. It was the second room in the small house, and was situated between the front room, which was used for business purposes, and a large room, which was used by lodgers. The hour was early, and anybody was likely to come into the room at any time, especially plaintiff's mother. The sister treated the incident lightly; she left the room laughing. Yet marriage is one of the most solemn engagements of life. She was several years older than plaintiff, and was herself a married woman —her husband an acrobat or clown in a circus. Her marriage was solemnized in due form. She knew what was necessary for a ceremonial marriage; nevertheless, she testified, believing that such a ceremony had been performed, she never inquired where it had taken place nor asked any questions whatever concerning the marriage. Such conduct is contrary to all accepted beliefs of the abiding interest taken by the female sex in wedding ceremonies.

Mr. Murray Smith was, admittedly, a man of character and a lawyer of high standing. It is inconceivable that in 1884 he should have assured plaintiff, her sister, and her mother that plaintiff was legally married to Mr. Grant, and in 1899, 15 years later, should have advised plaintiff to sign a deed of partition with her sister, in which the sister is described as "Kate Earp," she having married a man named Earp upon the death of her first husband, Howitt, and plaintiff is described as "Mollie T. Sheehan," her maiden name. We do not believe any honorable lawyer would have been guilty of such reprehensible conduct; and our conclusion is that Mr. Murray Smith did not, in 1884 or at any other time, advise plaintiff and her family that plaintiff was Mr. Grant's wife.

It is strenuously argued that the testimony of plaintiff and of her sister concerning the alleged agreement of marriage is corroborated by the ring worn by plaintiff, and which she exhibited in court; by the fact that for 40 years she was known by the name of Grant, and so addressed by the deceased, his friends, and his legal advisers; by the draft of a will which decedent sent to plaintiff to be used by her in drawing up her testament; by the education of the son under the name of James D. Grant; and by the attendance of the father and mother at the graduation exercises of the son at a college located at Bay St. Louis, Miss.

The possession of the ring by plaintiff does not prove that it was the foundation of her illicit relationship with the decedent. It could very well have been purchased by her, and this is probably the truth of the matter, when she removed to New Orleans assuming

the name of Grant and posing as a married woman to account for the existence of the child. Although prior to bringing the present suit plaintiff consulted two prominent members of the New Orleans bar, she admitted on the stand she never told either of them about the incident of the ring and the alleged visit of Mr. Murray Smith. She related to them all the other facts, and showed them all the letters and documentary evidence in her possession, but the two facts upon which she has builded her whole case she failed to disclose. Her explanation of this omission is that she had forgotten them; to use her own words, "it didn't come to my mind." They only came to her mind when Mr. Maloney, the attorney finally employed by her, began questioning her after he had consulted a Mississippi lawyer, and after her sister came from Shreveport to New Orleans and they got talking things over, and, says the witness, "What I didn't think of, why, she knew." If the ring episode and the visit of Mr. Smith were true, it is difficult to believe that plaintiff would not have remembered them, and that they would not have been the very first facts she would have brought to the attention of the lawyers whom she was consulting with the view of ascertaining and protecting her rights. The conclusion is inescapable that the only reason she failed to tell these lawyers the facts is because they did not exist, and that they were only created by plaintiff, with the aid of her sister, after she had ascertained from her counsel the requirements for a valid common-law marriage under the laws of Mississippi.

Plaintiff was not known by the name of Grant in Vicksburg. It was only when she removed to New Orleans with her child that she assumed the name, calling herself "Mrs. Mollie T. Grant," with a view doubtless of deceiving her relatives and neighbors. She never used the name "Mrs. James D. Grant."

The decedent never introduced her to any one nor acknowledged her as his wife. If she was not his wife, the mere fact that she called herself Mrs. Grant did not make her so.

It is not true that Mr. Grant's friends and his legal advisers ever knew her as the wife of Grant and addressed her as such. The evidence shows the contrary.

The form of the will which was sent by decedent to plaintiff to be followed by her in drawing up her testament did not, as contended by plaintiff, recognize her as the wife of Grant, and recognize "one of the issues of the union as James D. Grant, Jr." In this document she is referred to as "Mollie T. Grant," not as Mrs. James D. Grant nor as the wife of James D. Grant; and the word, "Jr.," does not appear after the son's name, nor is his full name given, he being identified merely by his initials. Moreover, he is referred to as the son of plaintiff and not as the son of plaintiff and James D. Grant.

It appears from the fragment of a communication which was accompanied by the form of will that it was sent to plaintiff at her request in order to insure the inheritance by her son of her property and to avoid possible litigation with her collateral relations.

It is clear that if a marriage existed between Mr. Grant and plaintiff, there would have been no necessity for him to have suggested that she make a will in favor of her son. As her legitimate son and legal heir he would inherit her property by the mere operation of law.

It is true that decedent provided the means for his son's education, in the course of which he attended St. Stanislaus College, at Bay St. Louis, and the Massachusetts Institute of Technology at Boston. The evidence shows that Mr. Grant was a generous and honorable man. There can be no doubt that he keenly felt his responsibility resulting from his youthful escapade. This is amply shown by

his conduct toward plaintiff in sending her sums of money from time to time, and in purchasing for her the house on Cadiz street, and in his endeavor to secure for his son an education which would enable him to adequately take care of himself. The son, however, notwithstanding his educational advantages, developed into a thoroughly disreputable character. He is a bankrupt, a self-confessed and admitted perjurer, forger, drunkard, wife deserter, embezzler, and is himself the father of three illegitimate children.

Intervener was registered at St. Stanislaus College only in the name of plaintiff. No father's name appears upon the college records. The district judge, in his reasons for judgment, states that his graduation exercises were attended by his father and mother. His only authority for this statement is derived from a newspaper item of the commencement exercises in which the names of several parties, among them "Mr. and Mrs. Grant," are given as being present. Plaintiff, however, would not swear that Mr. Grant was there, and we are satisfied that such was not the case. His presence at these exercises would have been wholly inconsistent with his attitude towards intervener, who was not entered on the college records, nor publicly recognized, as his son. It is more than likely that Martin accompanied plaintiff to the ceremonies, and was mistaken by the newspaper correspondent for Mr. Grant.

Plaintiff attaches much evidentiary value to a fragment of a letter apparently written to her by Mr. Grant shortly after his marriage to Miss Mabel Browne. She produced only the first sheet, which is undated and bears no address. The second sheet is missing and unaccounted for. Her testimony is that she found the sheet produced, with other pieces of letters, in a wash pitcher, where it had been deposited (presumably) since its receipt, a period of 15 years.

The letter contains the information of the marriage by a public ceremony of the writer as he had previously told plaintiff he intended to do in order to straighten out his family affairs, with the further statement that 'it would not lessen his desire for her welfare, and "whenever you need help let—." The rest is missing.

It is difficult, if not impossible, to place the correct interpretation on the meaning of the incomplete document which has been presented to the court. The writer is dead, and the court is without the benefit of his explanation of its contents.

The suggestion that the reference to the performance of a public ceremony was a recognition on the part of the writer that in the case of plaintiff he had had a private ceremony performed is unacceptable; first, because, according to plaintiff's own testimony there was not even a private ceremony in 1884; and, secondly, it is incredible that a man of Mr. Grant's intelligence, character, and business standing would notify his wife that he was going to take unto himself another wife by a public ceremony, thus committing an act of cruelty towards both women, in addition to violating the law of the land by committing bigamy.

Undoubtedly Mr. Grant had informed plaintiff of his approaching marriage. Just what occurred between them at the time will never be known. Grant is dead, and the plaintiff's version of the incident is unreasonable and does not commend itself to our favorable consideration. The writer's meaning is susceptible of several other interpretations. It may be that plaintiff requested him to be married privately so as not to attract undue attention to the affair, causing her embarrassment before her neighbors due to the similarity of the names, which request was refused by Grant, with the statement that he intended to have a public ceremony with as much notice as possible in order that there should be no misconception concerning

his status. His open and public marriage to the defendant was notice to the world that he was not married to plaintiff, and that intervener was not his legitimate son. Its effect was to place his family record on its proper basis. Prior to that time he was powerless to do anything to offset plaintiff's action in assuming his name and in giving it to her son.

Another explanation is that plaintiff, fearing that the approaching marriage might endanger the financial aid which she was receiving from Grant from time to time, may have threatened to expose the previous relations between them with the hope of preventing the marriage, resulting in the determination on decedent's part to accept the challenge by having a public ceremony performed, thereby inviting plaintiff to execute her threat, and also to proclaim to the world his right to marry whomsoever he pleased.

And there are other explanations which might be offered to account for the writing of the letter. But whatever may have been the underlying motive of the writer, we are unable to ascertain it with any degree of certainty, because the entire document is not before us.

Defendant, by oral and documentary evidence, established a number of facts and circumstances tending to disprove the allegations of the petitions of plaintiff and the intervener and to show the falsity of their claims.

The evidence shows indisputably that no matrimonial relations were established between plaintiff and Mr. Grant while they lived in Vicksburg, or elsewhere.

After the date of the alleged common-law marriage, plaintiff and the decedent never lived together as husband and wife. Mr. Grant lived in a boarding house in one section of the city, and plaintiff lived with her mother in another section of the city. Mr. Grant never at any time spent an entire night with plaintiff. He always took his breakfast and his other meals at his boarding house. He was never seen in public with plaintiff. He was regarded by the community as a single man, and plaintiff was regarded by the community as a single woman. Those who knew of his relations with plaintiff always regarded them as illicit.

Plaintiff's first child was born in New Orleans, where she came with the idea originally of procuring aid to prevent its birth. She was confined in the house of a negro midwife, in a squalid neighborhood. She did not notify her mother of the birth of the child, nor did she advise her relatives living in New Orleans of her situation. When she returned to Vicksburg she left the child in charge of negroes in New Orleans. This certainly was not the conduct of a woman lawfully married and the mother of a legitimate child.

After plaintiff's relations with Mr. Grant had ceased she formed an irregular connection with a man named Martin. Their relations were well known in Vicksburg. When Martin removed to New Orleans in 1897, plaintiff came to New Orleans in the same year. Mr. Grant had come to New Orleans two years previously.

When plaintiff gave birth to her second child, also in New Orleans, likewise in the home of a negro midwife in the midst of sordid surroundings, Mr. Grant was in Texas, where he had been for many months. This child was understood by those in a position to know the facts to be by another father. Although plaintiff gave it the name of Grant, he denied his responsibility for said child. This child died when about 11 years of age. Its death certificate did not give the name of any parents. When the body was removed from the receiving vault to its final resting place, the child was registered in the name of the mother alone. Its

grave, by a strange coincidence, adjoins the family plot of Martin.

While in New Orleans Mr. Grant lived in one part of the city and plaintiff in another. As a matter of fact, plaintiff never knew where Mr. Grant was living, and was unable to identify the photographs of any of the houses in which he resided. She was not able to produce one witness to testify that Mr. Grant had ever visited her. On the other hand, at every place she lived Martin was a frequent visitor, and was generally regarded by the neighbors as her husband, and his name was believed to be Grant.

Mr. Grant's intimate friends and associates never heard of plaintiff nor of her son.

The documentary evidence produced by defendant consisted, primarily, of deeds signed by plaintiff and letters written by her. Every deed signed or received by plaintiff after the date of the alleged common-law marriage described her as a single woman. In the years from 1885 to 1904 she signed or received eight deeds relating to property in Vicksburg in which she was interested, and which deeds were duly recorded according to law.

These deeds are as follows, viz.:

(1) Deed, dated April 16, 1885, from R. F. Beck, commissioner, to Mrs. Katie Howett and Miss M. T. Sheehan. This was 8 months after the alleged marriage.

(2) Deed, dated May 6, 1885, from widow and heir of John A. Klein to Mrs. Kate Howitt and Miss M. T. Sheehan. This was almost 9 months after the alleged marriage.

(3) Deed, dated March 14, 1888, from R. F. Beck to Katie Howitt and Mollie Sheehan. This was almost 4 years after the alleged marriage.

(4) Deed, dated March 16, 1888, from R. F. Beck to Kate Howitt and Mollie Sheehan. This was also about 4 years after the alleged marriage.

(5) Deed, dated February 28, 1899, being partition deed between Mollie T. Sheehan and Kate Earp, acknowledged before John Groome, justice of the peace, Warren county, Miss. This was 15 years after the alleged marriage.

(6) Deed, dated November 23, 1903, from Mollie T. Sheehan to Mrs. Catherine Earp. This deed was acknowledged by plaintiff on November 23, 1903, before Bernard C. Shields, notary public, in New Orleans. This was over 19 years after the alleged marriage.

(7) Quitclaim deed, dated December 31, 1903, from Catherine Sheehan (mother) to "Mrs. Catherine Earp and Mollie T. Sheehan, my daughters." This was also 19 years after the alleged marriage.

(8) Deed, dated October 29, 1904, from Mollie T. Sheehan to Vincent Lavecchia, acknowledged before J. M. Phillips, notary public, Vicksburg, Miss. This was 20 years after the alleged marriage.

In all of these deeds plaintiff is referred to by her maiden name, and she signs as such. On the other hand, her sister is referred to by her several marriage names, Howitt and Earp, and signs as such. It is also worthy of special note that in the deed dated December 31, 1903, from plaintiff's mother, the conveyance is made "unto *Mrs. Catherine Earp and Mollie T. Sheehan, my daughters.*" (Writer's italics.) This deed was executed about 19 years after the alleged marriage.

These instruments would seem to furnish conclusive evidence of plaintiff's status according to her own conception and that of her mother and her sister.

On June 4, 1906, by an act before Gurley, notary of New Orleans, plaintiff appeared as the purchaser of a small cottage on Cadiz street. In this deed she appears under the name of "Miss Mollie T. Grant." The purchase price of this house was $2,800, which was furnished by Mr. Grant. The transac-

tion was handled by Mr. James E. Zunts, Mr. Grant's personal attorney. The evidence shows that Mr. Grant knew that plaintiff was living with Martin, who was a shiftless character, and that he wanted to make her comfortable by giving her this home, a modest cottage on a small lot in a respectable, but poor, neighborhood.

Plaintiff states that she signed the act of sale in the manner described under the coercion of Mr. Zunts, and she now pretends that the transfer to her of the cottage was a scheme concocted by Grant and Zunts to suppress the evidence of her marriage with Grant. Mr. Zunts lost his reason shortly after the death of Mr. Grant, and at the time of the trial was confined to a psychopathic hospital, and was in no condition to give his testimony.

Mr. Zunts was an honorable lawyer, well thought of by the bench and bar, and we do not believe that he would have been guilty of the dishonorable action with which he is sought to be charged by plaintiff. The true story of the transaction, as we see it, is that plaintiff, who had held herself out to her neighbors by the name of Grant, was desirous of retaining the name, and that Mr. Zunts, who knew that she was not a married woman, was not willing to have the transfer made to her as such, and the expedient of describing her as "Miss Mollie T. Grant," an unmarried woman, was adopted as a way out of the difficulty. A memorandum taken from the private files of Mr. Zunts, and which was produced by defendant at the request of counsel for plaintiff, indicates that Mr. Zunts at one time entertained doubt as to whether plaintiff could safely use the name of Grant at all in the deed in order to pass a good title. The memorandum contains a list of authorities, evidently examined by him, holding that a deed to a person under a fictitious name effectively conveys title if the person can be identified.

The conspiracy charge against Mr. Grant is also unbelievable. The testimony in the record is overwhelming as to his fine character and generous instincts. He had been for years extending financial assistance to plaintiff in the way of monthly advances in sums varying from $20 to $45. These remittances were made through Mr. Zunts even after Grant's marriage with the defendant. It was quite in keeping with his generous disposition and his evident interest in plaintiff's welfare, which is rather to his credit than to his discredit, that he should desire, on the eve of his marriage, to secure plaintiff in the possession of her own little home where she might be comfortable in her declining years.

Moreover, it seems to be too plain to admit of argument, if plaintiff was a married woman, she would never have permitted herself to be designated as an unmarried woman. Every legally married woman carefully guards her reputation as much. Plaintiff was under no necessity to sign the deed. If Grant was her husband, she could have demanded that he furnish her with a home and support in accordance with his position and means.

On September 12, 1921, plaintiff acquired by a deed before Schneidau, notary in New Orleans, six lots of ground in Metarie Court. In this act of sale she is described as "Mrs. Mollie Sheehan, divorced wife of James Grant." Not James D. Grant. This transaction was conducted by plaintiff personally. She says that, when she told Mr. Zunts of her purchase, and that she was going to sign as Mrs. Mollie T. Grant, he asked her what she was going to tell them; her reply was "that she was going to tell them the truth," when he remarked that, if she did, she was going to get people into trouble, and he advised her, if she was asked if they were separated, to say, "Yes," and then to sign whatever they would put before her. Again

Mr. Zunts, because of his illness, is silent. The evidence of the notary and his clerk, however, shows that the description of plaintiff's marital status in the act was given by plaintiff herself, and that Mr. Zunts was not present at the execution of the deed, and had nothing whatever to do with the transaction.

There are seven deeds in the record signed by Mr. Grant. They cover lands in Texas, Louisiana, and North Carolina. The first one, executed in 1890, six years after the alleged common-law marriage, shows Grant to be a single man. In the other deeds, beginning with the one of August 12, 1908, and ending with the one of April 16, 1920, Grant is shown to be a married man, his wife being the defendant Mabel Seay Browne Grant.

These deeds furnish evidence of Mr. Grant's conception of his marital status, and are complementary to the deeds showing plaintiff's conception of her marital status. All these instruments are silent but powerful witnesses against the verity of plaintiff's claims.

Finally, the marriage of Mr. Grant to the defendant took place in November, 1907, and they lived publicly and openly as husband and wife until the death of Mr. Grant, a period of 15 years. Plaintiff had immediate knowledge of the marriage, yet she took no steps to contest it nor to demand her alleged matrimonial rights. Plaintiff would have the court to believe that, although she was the wife of Mr. Grant, she sat idly by, content with a mere monthly pittance, while another woman was enjoying the wealth and social position to which she was justly entitled. Such conduct belongs to the miraculous, and is entirely outside of the common experience and observation of mankind. We are unable to accept even its probability, much less its verity. The reason that plaintiff did not assert her matrimonial rights is because she had none to assert. She has not improved her position by delaying the presentation of her claim until after the lips of Mr. Grant were sealed by death.

Plaintiff's story is incredible, and, while it might well serve the realm of fiction, it has no place in the annals of truth.

For the reasons assigned, the judgment appealed from is annulled, and it is now ordered that there be judgment in favor of Mrs. Mabel Browne Grant, widow of James D. Grant, and against plaintiff, Mrs. Mollie T. Sheehan (styling herself the widow of James D. Grant), rejecting her demands and dismissing her suit, and against the intervener, styling himself James D. Grant, Jr., rejecting his demands and dismissing his intervention. Plaintiff and intervener to pay all costs of this suit.