## PILLARD *v.* PILLARD.

1. MARRIAGE—SUIT TO ESTABLISH COMMON-LAW MARRIAGE—ISSUES INVOLVED.

In a suit by a wife under 3 Comp. Laws 1915, § 11395, to affirm a common-law marriage, the court is not called upon to decide whether plaintiff's consent to said marriage, after her experience in the field of matrimony, is imputable to easy indifference or gullibility.[1]

2. SAME—COMMON-LAW MARRIAGES ARE VALID.

While common-law marriages are a fruitful source of perjury, generally imputable to the turpitude of one or both of the contracting parties, they are valid and enforceable.[2]

3. SAME—ISSUES INVOLVED—MOTIVES OF PLAINTIFF IN BRINGING SUIT IMMATERIAL.

In said suit, the only question for determination is whether a common-law marriage is shown; the court not being concerned with the motives of plaintiff in pressing the suit.[3]

[1]Marriage, 26 Cyc. p. 899 (1926 Anno); [2]Id., 26 Cyc. p. 838; [3]Id., 26 Cyc. p. 899 (1926 Anno).

On effect of statute on common-law marriage, see note in 2 L. R. A. (N. S.) 353.

On general characteristics and validity of common-law marriage, see note in L. R. A. 1915E, 8.

4. SAME—EVIDENCE SUFFICIENT TO ESTABLISH COMMON-LAW MAR-
    RIAGE.
    The finding of the court below that the evidence was suf-
        ficient to establish the existence of a common-law mar-
        riage, *held*, sustained by the record.[4]

Appeal from Washtenaw; Sample (George W.), J.
Submitted October 10, 1924.    (Docket No. 78.)    De-
cided April 24, 1925.

Bill by Mary Pillard against Louis Pillard for af-
firmation of a common-law marriage.    From a decree
for plaintiff, defendant appeals.    Affirmed.

*Louis E. Burke*, for plaintiff.

*Arthur Brown*, for defendant.

STEERE, J.    Plaintiff filed this bill in the circuit court
of Washtenaw county, in chancery, under 3 Comp.
Laws 1915, § 11395, to obtain a decree confirming an
alleged common-law marriage between the parties,
which defendant denied.    The case was brought to
issue and heard in open court resulting in a decree
affirming said marriage, from which defendant has
appealed.

The parties were originally married on April 6,
1911, in Florida by a clergyman and lived together as
husband and wife, until some time in 1921, when
defendant deserted plaintiff and went to live with
another woman, named Mrs. Penny, who while living
with him in Ann Arbor was known as Mrs. Pillard.
The parties to this suit are of southern antecedents
and both seem to have led a somewhat migratory life,
both before and after their marriage.    Defendant
is a native of Brazil and came to the United States
when quite young, his name then being Lawrence
Rawana Piechowski.    Apparently some time before

---

[4]Marriage, 26 Cyc. p. 883.

he was first married to plaintiff he anglicized his name to Louis Pillard.    She was born in Missouri but met and married defendant in Florida where they lived for a time and migrated from there to Mississippi, then to Alabama, then to Ohio, and from Toledo in that State they moved to Michigan, and have since limited their migrations to various cities in this State.

After defendant left plaintiff and she learned he had ostensibly taken to himself another wife, she filed a petition in the Wayne county circuit court, in chancery, on February 5, 1922, asking a decree under the statute for annulment of their marriage, alleging that since he deserted her she had learned that at the time of their marriage on July 6, 1911, he had a lawful wife then living in Mobile, Alabama, by whom he had a daughter, who was living in New Orleans at the time plaintiff filed her petition; that not only had he a lawful wife living at the time of his pretended marriage to plaintiff, but also, on July 5, 1905, had in form of law, but illegally, married another woman known as Mollie Poniatowski, who bore him a child and was deserted by him in 1910, the year before his unlawful marriage to plaintiff, at which time he represented himself as unmarried.    Her petition for annulment was taken as confessed, and hearing had thereon in the Wayne county circuit court, in chancery, resulting in a decree, dated August 7, 1922, declaring the marriage of April 6, 1911, between these parties void and annuling the same.

In the meantime defendant filed a bill for divorce against plaintiff in the Jackson county circuit court, in chancery, and there obtained a decree of divorce from her on June 22, 1922; on what date or grounds he filed his bill the record does not disclose, but it does appear that on December 10, 1923, it was set aside by the court.    The decree setting it aside names plaintiff herein as the petitioner, states both parties were

present in court with their counsel, and the decree setting aside said divorce was by consent.

In October, 1922, plaintiff was living with her mother in a rooming house on Woodland avenue in the city of Detroit. She had not then seen defendant for a year, but learning he had been looking for her sent her mother to find why he wanted to see her. He accompanied her mother to their home and, as she states, greeted her affectionately in a penitent frame of mind, expressing sorrow for treating and leaving her as he did, confessed his former matrimonial delinquencies, asserted that one of his former wives was dead and the other had got a divorce from him and was married again. They had a long talk during which both of them wept and he asked her to come back to him and be his wife again, and she promised to do so.

Her explanation of their resuming married relations under a private common-law contract to be man and wife is that he said in substance an official marriage was not necessary and under the circumstances would be a mistake; they had been together so long before that they could be just as true to each other as if another marriage was performed and she already had her certificate of marriage with him to prove it. The substance of this marriage contract was repeated in later visits by defendant at plaintiff's home. Her mother, an elderly woman 71 years of age, testified that he said to her daughter:

" 'Mary, if you can forgive me for all the wrongs I ever did you and you will come back and live with me as my wife I will be glad to take you and your mother and support you.' He said a common-law marriage was all right.

"*Q*. What did she say to him?

"*A*. She agreed to it."

Following this reconciliation the parties resumed their married relations.

Defendant was then working in Ann Arbor where he had been living with Mrs. Penny who had then deserted him, but visited plaintiff in Detroit several times. About November 30th he took plaintiff and her mother to Jackson and put up at the Dalton hotel where he registered them all as of Detroit, plaintiff's mother as "Mrs. L. R. Cox," and himself and plaintiff as "L. R. Pillard and wife." Claiming he could find no satisfactory quarters for them to establish a home in Jackson, he took them the following day to the home of Mrs. Aichele in the village of Chelsea where he had previously made tentative arrangements for quarters, and secured apartments in which they established their home with him as head of the family. He introduced plaintiff as his wife and her mother as his mother-in-law to Mrs. Aichele and others whom they met there. They were generally so introduced and known while living in Chelsea. He occupied a bedroom with plaintiff, paid the rent and furnished the provisions for their home, while plaintiff and her mother cared for the household. On an occasion when he was sick for a time plaintiff nursed and cared for him.

Defendant made a general direct denial of any intent or facts showing a common-law marriage but his feeble and evasive answers when categorically interrogated on the subject bordered on the ridiculous. A few of his answers were as follows:

Of their reconciliation he was asked—

"Q. Didn't you say 'What I want you to do is to come back and stay with me and be my wife?'
"A. Not as I can remember.
"Q. Did you?
"A. I did not.
"Q. Did you tell her a marriage ceremony was not necessary in this State?
"A. Not as I know of.
"Q. Will you say you did not?
"A. I don't know.

"*Q.* And you two could be husband and wife without a marriage ceremony as well as with?

"*A.* Not as I know of.

"*Q.* Do you say you did not tell her that?

"*A.* I don't know.

"*Q.* And didn't she say to you, believing the statement I have related, that she would do that?

"*A.* I don't know anything about that.

"*Q.* She would enter marriage with you and from that time you were husband and wife?

"*A.* I don't know anything about it.

"*Q.* You will not say you did or did not?

"*A.* I don't know anything about it, don't recollect the conversation at all."

Asked if he did not register himself and plaintiff as husband and wife at the Dalton hotel on November 30, 1922, he replied:

"I don't recollect, I think I went to some hotel, I don't say which. I think they got a room between themselves and I took a room.

"*Q.* Will you say you did not so register?

"*A.* I would not say I did or did not, I may have registered at a hotel.

"*Q.* Do you say you did not register yourself and the plaintiff as husband and wife?

"*A.* Not to my recollection, I may and may not. I couldn't say.

"*Q.* You can tell your handwriting when you see it?

"*A.* I think I can. * * *

"*Q.* I show you this page marked Exhibit 2, and ask you to state whether or not that is your signature on line six, of this exhibit?

"*A.* That is my name.

"*Q.* That is not what I ask you.

"*A.* Well, I think that is my writing, I think the name Pillard is, I don't think I wrote the word wife, I don't know. It does not look like my name. * * *

"*Q.* Your claim is now that the first part is your signature but the latter part is not, is that it?

"*A.* I don't think it is. L. R. Pillard is my signature.

"*Q.* But that wife is not?

"*A.* I will not swear to it."

Of his living at Chelsea with plaintiff as husband and wife, he was asked and answered in part as follows:

"*Q.* You were sleeping then with Mary every night?
"*A.* No, sir.
"*Q.* You had just one sleeping room upstairs?
"*A.* I had a suite upstairs, a suite of rooms.
"*Q.* Don't you know, as Mrs. Aichele testified, that you rented three rooms downstairs and one upstairs?
"*A.* I don't know how many there were at all.
"*Q.* Did you rent more than one room upstairs?
"*A.* I don't know whether I did.
"*Q.* Don't you know as a matter of fact you rented one upstairs room and in that there was one bed and every night for three and a half months you and Mary occupied this bed as husband and wife?    Answer yes or no.
"*A.* No.
"*Q.* Did you ever sleep with Mary in these rooms that you rented in the home of Mrs. Aichele?
"*A.* I slept upstairs.
"*Q.* With Mary?
"*A.* I don't know whether she was there or not.
"*Q.* Do you mean to tell the court you don't know whether a woman was in bed with you or not?
"*A.* She may.    I don't say whether she did or not. I rented the place and I expect to sleep where I pay my rent.
"*Q.* You don't know whether you slept with Mary or not?
"*A.* I claim I slept where I paid my rent.
"*Q.* And did you sleep with Mary?
"*A.* She may have slept there but she did not every night because I was not there.    You say I slept there every night.    I say I did not.
"*Q.* Did you sleep with Mary at all in this house?
"*A.* Yes.
"*Q.* Did you have sexual relations with her?
"*A.* I don't say that at all, I don't say I did or did not.
"*Q.* Don't you know whether you did or not?
"*A.* No, I do not."

After they had established their home in Chelsea

their domestic affairs apparently ran smoothly during the ensuing winter and spring until about the middle of June, 1923.    He was not, as he states, there every night as his work required him to be absent at times, but was home quite regularly until about a week before June 18th.    About a week after that date he came home for the last time and told plaintiff his employment took him to Chicago, which would be his headquarters and he was going to sell his furniture. Plaintiff asked if she could go with him but he said his work would also take him to "St. Louis and all over" and she could stay where she was or go to Toledo and he would send her money.    It was shown without question that on June 18, 1923, he secured a marriage license from the county clerk of Livingston county in which he swore he was a single man and, on the same day, married a widow woman named Rena Rose of Ann Arbor and, as her husband, became an inmate of her home at or near that city.

Learning that defendant made his headquarters in Ann Arbor, instead of Chicago, as he had led her to believe, plaintiff filed this bill under the statute cited, which provides:

"SECTION 4. When the validity of any marriage shall be denied or doubted by either of the parties, the other party may file a bill or petition in the manner aforesaid, for affirming the marriage; and upon due proof of the validity thereof, it shall be declared valid by a decree or sentence of the court; and such decree, unless reversed on appeal, shall be conclusive upon all persons concerned."

This court is not called upon to decide whether plaintiff's consent to a common-law marriage after her experience in the field of matrimony is imputable to easy indifference, or gullibility.    While common-law marriages are a fruitful source of perjury, generally imputable to the turpitude of one and sometimes both of the contracting parties, the courts as a general rule yet

recognize them as valid and enforceable, both for protection of the innocent and to hold to the consequences of their civil contracts those who are prone to wantonly indulge in predatory marriages. Of the latter type defendant figures in this record as a past master.

Defendant makes no claim that during their married life plaintiff was not a loyal and faithful wife to him. There is no evidence in the case pointing to any questionable conduct on her part with other men. With her motives in pressing these proceedings the court is not concerned. The only question for determination is whether a common-law marriage is shown. That there was no legal impediment to their marriage at the time is shown by the testimony of both parties. When squarely asked "Did you have any living wife at all at that time, if you know?" defendant replied "No, sir."

It was early said by this court, speaking through Justice COOLEY, and has long been recognized as the settled law in this State and in many other jurisdictions, that—

"Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations." *Hutchins* v. *Kimmell*, 31 Mich. 126.

We are not impressed with the arguments of defendant's counsel that these essential facts are not fairly shown here by a preponderance of the evidence. After a careful examination of this entire record we find no occasion to disturb the following findings of the trial judge who saw the witnesses and heard their testimony as it was given:

"According to the evidence of the defendant, as well

as other competent testimony, the defendant was competent at the time alleged by the plaintiff to enter into a contract of lawful marriage with the plaintiff.    The court finds that a vast preponderance of the evidence shows that all of the elements necessary to constitute a common-law marriage between the plaintiff and defendant are present in this cause.    The court finds that an agreement between parties to live together as husband and wife was entered into.    And also that the defendant held out to the public that she was his wife and that he actually lived with her as his wife."

The decree will stand affirmed, with costs to plaintiff.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.