LEFKOFF *v.* SICRO, administratrix, *et al., el vice versa.*

Nos. 12771, 12781.  December 5, 1939.
Adhered to on Rehearing December 18, 1939.

*Claud E. Moore* and *Cecil V. Whiddon,* for plaintiff.

*A. S. Grove,* for defendants.

Reid, Chief Justice.  The plaintiff, styling herself as Mrs. Essie Harris Lefkoff, brought a petition in equity against Perle L. Sicro individually and as administratrix of the estate of Mike Lefkoff, deceased, Ethel Lefkoff Friedman, Wolfe L. Lefkoff, Louis R. Lefkoff, Sara Lefkoff, Rebecca Lefkoff Lefkowitz, Stephen Lefkoff, Charles Lefkoff, and Ida Lefkoff, and made substantially the following case: Petitioner became the wife of Mike Lefkoff in the year 1925, and was so related to him at the time of his death in September, 1936. "Mike Lefkoff . . agreed to and with petitioner in 1925 . . that petitioner and said Mike Lefkoff would enter into and bear the relationship, each to the other, respectively, of wife and husband, and . . said relationship continued between petitioner and said Mike Lefkoff until" his death.  Due to the difference in religious beliefs of petitioner and Mike Lefkoff, they agreed that their marriage would not be a ceremonial one, but that their marriage would be celebrated by living together as man and wife.  Deceased had been very ill prior to his marriage to petitioner, and when thereafter she became ill, fearing that she

had contracted tuberculosis from him, he took her "and spent a week in Miami with petitioner at a hotel, . . registering for himself and petitioner as man and wife." This was in July, 1925. At the expiration of this week the deceased instructed her to remain in Florida until she regained her health, which she did for a period of nine months. Deceased gave petitioner $500 at that time, and gave her another $500 on a visit made to her thereafter during said nine months. In April, 1926, she returned to Atlanta, and they lived at various addresses as man and wife until the date of his death. During all of this time deceased "held petitioner out as his wife to persons with whom he and petitioner came in contact, and maintained petitioner as his wife by providing for her food and clothing, shelter, and the necessities of life, including medical attention." From 1925 until the date of his death deceased was engaged in the mercantile business, operating several stores. Petitioner occupied the position of cashier at his main store, which was operated under the name of "Macleff's." Her name did not appear on the pay-roll of the business. After the death of deceased his father told her: "Essie, don't worry, you are a member of the family, and we are going to take care of you." While being thus led to believe that she was recognized by the family as the wife of the deceased, the defendants, brothers and sisters, father and mother of deceased, applied to the ordinary of Fulton County, "representing themselves to be the heirs of said Mike Lefkoff, . . and procured the appointment of Perle L. Sicro" as administratrix of his estate. Defendants falsely and fraudulently represented to the ordinary that the estate had a valuation of only $7500. In truth and in fact said estate had a gross valuation of $50,000. Defendants now deny that petitioner is the wife of deceased, and withheld from the ordinary such fact, and "represented that they were the sole and only heirs of said Mike Lefkoff." Petitioner is the sole heir of deceased, and she will suffer irreparable injury and damage unless a court of equity intervenes. Petitioner and deceased, through simple living, extreme care, and wise management, were able to, and did, found and operate profitably and successfully four stores. The defendant administratrix turned the management of said stores over to Louis Lefkoff, one of the brothers and a defendant, who is without sufficient experience to operate said enterprise, and "there is grave

danger that said estate will be dissipated and lost through said Louis Lefkoff's inexperience." In order to protect the interest of petitioner "and all persons" a receiver should be appointed under a good and sufficient bond "to protect creditors and all persons in interest of said estate." Wolfe K. Lefkoff, Stephen Lefkoff, and Rebecca Lefkoff Lefkowitz, are non-residents, and should be served by publication as provided by statute in such case. She prayed that she be "decreed to be the lawful wife and widow of Mike Lefkoff;" for an accounting with the administratrix, and judgment for the amount found due to her as sole heir of deceased; for a receiver; for injunction restraining defendants from interfering with the property belonging to said estate; and for general relief.

An amendment of the petition was in substance as follows: The bond of $15,000 made by the defendant administratrix is grossly inadequate, in that the total sum of the property returned for taxes by the administratrix individually and her sureties aggregates only $4065. Charles Lefkoff, one of the sureties, and the only one returning any real property, returned for taxation property in the sum of $3015, "which leaves subject to said bond only $1415 over and above said sureties' right of exemption under the homestead laws of Georgia." The other surety, J. I. Sicro, returned $400 of personal property composed of household goods and an automobile. The operation of the business of the deceased by Louis R. Lefkoff "has resulted in the depletion, since September of 1936 to date, of the merchandise inventory from $39,027.59 to approximately $26,-000, without a corresponding satisfaction of debts of the business." The business is thus being mismanaged, and waste committed; "and if allowed to continue, petitioner's interest in said estate and the interest of all creditors, aggregating approximately $11,-000, will be defeated." For the stated reasons irreparable injury will result to petitioner "and other persons holding claims against said estate," if a court of equity does not intervene. A prayer was added that the appointment of Perle L. Sicro, administratrix, be vacated and set aside.

The defendants answered. Demurrers were filed (1) by the non-resident defendants, (2) and the other by all of the resident defendants except Ethel Lefkoff Friedman. By stipulation of the parties the trial was restricted to the sole issue whether the plaintiff was in fact the lawful wife of the deceased. The jury re-

turned a verdict in favor of the defendants, and the plaintiff excepted to the overruling of her motion for new trial. Defendants by cross-bill of exceptions assigned error on the overruling of their demurrers.

■ The judge charged the jury as follows: "If there was an agreement to live together as husband and wife, that agreement must be absolute and mutual as to both parties. If either of the parties to such an agreement, if there was such an agreement existing, conceal their relations from the public generally, and does not openly admit to the world that they are man and wife, it would not be a common-law marriage." He further charged: "If you believe from the evidence in this case that either of the parties concealed their alleged relationship, one to the other, and did not openly acknowledge to the public that they were husband and wife, and hold themselves out to be such to the world, then you would not be authorized to find in favor of the plaintiff." Exceptions are taken to these charges.

"Marriage . . is the civil status of one man and one woman legally united for life, with the rights and duties which, for the establishment of families and multiplication and education of the species, are, or from time to time may thereafter be, assigned by the law to matrimony." 1 Bishop on Marriage, Divorce, and Separation, 5, § 11. This relation arises out of the voluntary contract of the parties whereby they mutually consent to be thenceforward husband and wife. Code, § 53-101. In England, before Lord Hardwicke's act of 1753, 26 Geo. II, c. 33, the contract of marriage was considered as merely a civil contract. While it was no doubt customary for parties to have their marriage solemnized in the church and in the presence of witnesses, it appears that this was not necessary, and no particular formality was required in the execution of the marriage contract. The intervention of neither civil nor religious authorities was essential to its validity, but it rested solely upon the mutual voluntary consent of the parties thereto. This informal marriage is what has been generally referred to as the common-law marriage. In England, since the passage of the above act, and in many if not all of the States of the Union, including our own, the marriage contract has been the subject of regulation, and certain formalities have been prescribed for its execution. Not a few of the reviewing courts of

other States have taken the view that their legislation regulating the marriage contract and its execution, taken as a whole, disclosed an intention on the part of the legislature to thereby abrogate the common-law doctrine of the validity of a private informal marriage, and have accordingly held invalid marriage contracts not consummated in accordance with the requirements of such legislation. Milford v. Worcester, 7 Mass. 48; Dunbarton v. Franklin, 19 N. H. 257; Morrill v. Palmer, 68 Vt. 1 (33 Atl. 829, 33 L. R. A. 411); Wilmington Trust Co. v. Hendrixson, 31 Del. 303 (114 Atl. 215); Dennison v. Dennison, 35 Md. 380. While, as above noted, our own legislature has prescribed various formalities for the execution of a marriage contract, such as the application for the issuance of marriage licenses by the ordinaries (Code, §§ 53-201, 53-202), the record thereof (§ 53-203), the posting of notices of the application for license of parties under the age of twenty-one years (§§ 53-204, 53-205, 53-206), and has provided a penalty against the ordinary for failure to comply with such provisions (Code, § 53-208), and a penalty against any judge, justice of the peace, or minister who shall join in marriage any couple without a license, or the publication of bans (§ 53-201), it has nevertheless been uniformly held by the courts of this State, for almost a century, that a compliance with these provisions is not essential to the validity of a marriage contract, and that an informal contract of marriage executed without such formalities, is valid and binding. Askew v. Dupree, 30 Ga. 173; Dillon v. Dillon, 60 Ga. 204; Smith v. Smith, 84 Ga. 440 (11 S. E. 496, 8 L. R. A. 362); Dale v. State, 88 Ga. 552 (15 S. E. 287); White v. White, 41 Ga. App. 394 (153 S. E. 203); Clark v. Cassidy, 62 Ga. 407; Clark v. Cassidy, 64 Ga. 662; Smith v. Reed, 145 Ga. 724 (89 S. E. 815, L. R. A. 1917A, 492); Harper v. A. & W. P. R. Co., 33 Ga. App. 259 (125 S. E. 885); Heflinger v. Heflinger, 161 Ga. 867 (132 S. E. 85). In the interim, our legislature has expressly indicated its approval of the doctrine; for when the codifiers of the Code of 1863 sought to require the publication of bans as a prerequisite to the validity of a marriage contract, the legislature promptly repealed that section. See Smith v. Smith, 84 Ga. 440 (11 S. E. 496, 8 L. R. A. 362). The rule thus adopted in this State seems to be the preponderating view in this country. 39 A. L. R. 538; 60 A. L. R. 541; 94 A. L. R. 100.

In *Askew* v. *Dupree,* supra, the common-law principles concerning marriage were discussed, and the binding force of these principles in this State firmly established. It was there said: "Marriage . . in its inception, by the common law, is a civil contract founded on the consent of the parties. . . Marriage, being a contract, is of course consensual, for it is the essence of all contracts to be constituted by the consent of both parties. *Consensus, non concubitas, facial matrimonium,* the maxim of the Roman civil law, is in truth the maxim of all law upon the subject. . . Marriage being a civil contract, it is not necessary that it be solemnized by a person in holy orders, and *in facie ecclesiæ.* . . If the contract be made *per verba de presenti* [in words of the present tense], and remains without cohabitation, or if made *per verba de futuro* [in words of the future tense], and be followed by consummation, it amounts to a valid marriage in absence of all civil regulations to the contrary, and which the parties (being competent as to age and consent) can not dissolve, and it is equally binding as if made *in facie ecclesiæ.* There is no recognition of any ecclesiastical authority, in forming the connection; and it is considered entirely in the light of a civil contract." The court concluded "that marriage is founded in the law of nature, and is anterior to all human law; that in society it is a civil contract; that if the contract is *per verba de presenli*—that is, I take you to be my wife, and I take you to be my husband—though it be not consummated by cohabitation, or if it be made *per verba de 'futuro,* and be consummated, it amounts to a valid marriage, in the absence of all municipal regulations to the contrary; and that notwithstanding there be statutes directing a license to issue, as in this State, and inflicting a penalty on any minister or magistrate who shall unite the parties in wedlock without such license, yet, in the absence of any positive enactment declaring that all marriages not celebrated in the prescribed form shall be void, a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment, is still a valid marriage." The celebrated case of Dalrymple *v.* Dalrymple, 2 Hagg. Const. 54-137, 161 Eng. Rep. 665, 17 Eng. Rul. Cas. 10, cited and quoted in the *Askew* case, stands as ample authority for the principles there stated. See also complete discussion of the doctrine,

in 1 Bishop on Marriage, Divorce, and Separation, 124-130; 2 Kent's Commentaries (14th ed.), 119-123; 1 Blackstone, c. 15; 3 Bryce, Marriage and Divorce, Select Essays in Anglo-American History, 812, 813, 814; 2 Pollock & Maitland, History of the English Law, 368; 2 Schouler, Marriage, Divorce, Separation, &c., 1425 et seq. Although the Dalrymple case was thereafter overruled by the House of Lords in Queen v. Millis, 10 Clark & Finelly, 534 (although the Lords were evenly divided), wherein it was ruled that by the ecclesiastical and the common law of England the presence of an ordained clergyman was from the remotest period onward essential to the formation of a valid marriage, it is agreed by all authorities that the decision in the Millis case was historically unsound, and that the learned and exhaustive opinion of Lord Stowell (by many classed as England's greatest ecclesiastical judge) in the Dalrymple case expressed the true law. See 1 Bishop, Marriage, Divorce, and Separation, § 401; also explanation of Millis case by Pollock and Maitland, in their exhaustive work, History of the English Law. It is of course true that we are not bound by the Millis case as to what was the common law upon the subject, but may, as was done in the *Askew* case, supra, determine that question for ourselves.

Bishop, in his work, supra (vol. 1, 124), fully considers the common-law principles of marriage, and says, in part: "To render competent parties husband and wife, they need and need only mutually agree in the present tense to be such,—no time being contemplated to elapse before the assumption of the status. . . The consent essential to marriage must contemplate a present assumption of the status, in distinction from a mere future union." Kent, whose decision in Fenton v. Reed, 4 Johns (N. Y.), 52, did much to establish the common-law doctrine in this country, said in 2 Commentaries (14th ed.) 119-123: "No peculiar ceremonies are requisite by the common law to the valid celebration of the marriage. The consent of the parties is all that is required; and as marriage is said to be contract *jure gentium,* that consent is all that is required by natural or public law. . . The consent of the parties may be declared before a magistrate, or simply before witnesses, or subsequently confessed or acknowledged, or the marriage may even be inferred from continual cohabitation, and reputation as husband and wife." Under these authorities, we believe

it to be reasonably clear that if a man and woman, competent to do so, voluntarily and in good faith consented to be man and wife, actually looking towards the *consortium vitæ*, that is, actually contracting to then assume the status of man and wife, they were thereupon considered by the common law as married, and are accordingly so considered in this State. Therefore the question presented in cases where there is an issue of marriage vel non is, did the parties in good faith voluntarily enter into a contract mutually consenting to be man and wife, with the intention of thereby and thereupon assuming that relationship? Courts are of course concerned with proof of the marriage; that is, proof of that mutual consent between the parties to be bound together in the relationship of man and wife. To this end evidence may be produced that the parties actually complied with the formalities prescribed by law, which if credible conclusively establishes the relationship. We have seen however, that the contract of marriage need not take this form. Therefore, in the absence of this, evidence may be produced which directly establishes a private written or oral agreement between the parties. Still again, circumstantial evidence may be produced which tends to establish the existence of a contract between the parties, in that it may be proved that the parties openly cohabited conducting themselves as man and wife, representing themselves to be such, which is commonly referred to as "habit and repute." Proof of any one of these is at least prima facie sufficient to establish the existence of the marriage relation between the parties. In the case of habit and repute, the law, ever indulgent, leaning towards morality rather than immorality, presumes, in the absence of direct evidence, that the parties at some time mutually consented to be man and wife (*Miller* v. *Grice,* 165 *Ga.* 191, 140 S. E. 350), though it is to be here noted that it is not thereby presumed that the parties consented in any particular manner,—that is, that they privately agreed to become man and wife, rather than by compliance with all the formalities prescribed by statute, and that a case involving the issue of marriage vel non, where the only evidence is "habit and repute," does not necessarily involve a common-law marriage, as is commonly supposed.

Since parties take upon themselves the relationship of man and wife by voluntary mutual consent, intending thereby and thereupon to assume such relationship to each other, no further acts, such

as public cohabitation, need be performed, before they occupy such status. Their public cohabitation as man and wife constitutes evidence of their consent to be such, and is not an act essential to the formation of the marriage relation. Proof that the parties did not cohabit merely constitutes evidence against the marriage. This seems clear from the mere statement of the common-law doctrine of consent *per verba de presenti*, and *per verba de futuro cum copula*. See *Askew* v. *Dupree*, supra; *Nelms* v. *State*, 84 *Ga.* 466 (10 S. E. 1087, 20 Am. St. R. 377); Great Northern Ry. Co. v. Johnson, 254 Fed. 683; Renfrow v. Renfrow, 60 Kan. 277 (56 Pac. 534); Hilton v. Roylance, 25 Utah, 129 (69 Pac. 660); In re Svendsen's Estate, 37 S. D. 353 (158 N. W. 410); Hutchinson v. Hutchinson, 196 Ill. 432 (63 N. E. 1023); Arnold v. Chesebrough, 58 Fed. 833; Green v. Green, 77 Fla. 101 (80 So. 739); Cooper v. Cooper, 11 N. J. Misc. 720 (168 Atl. 153); In re McLaughlin's Estate, 314 Pa. 574 (172 Atl. 107); Corn v. Carey, 105 Pa. Super. 363 (161 Atl. 410); Jackson v. Winne, 7 Wend. (N. Y.) 47 (22 Am. D. 563); Dumaresly v. Fishly, 10 Ky. 368. The Code, § 53-101, does not authorize a different ruling. That section is as follows: "To constitute a valid marriage in this State there must be—1. Parties able to contract. 2. An actual contract. 3. Consummation according to law." This section first appeared in the Code of 1863 as § 1653. §§ 1652 through 1668 in that Code were grouped under the title "Marriage—how and by whom contracted," and constituted a complete scheme of regulation of marriage in this State. By § 1658 it was declared: "To render valid a marriage in this State there must be either a license previously granted by the proper officer authorizing such marriage, or a publication of the bans of marriage in a neighboring church, in the presence of the congregation, for at least three sabbath days prior to its solemnization." This section abrogated the doctrine of the common-law marriage, and specifically required either a license or the publication of bans, as a prerequisite to a valid marriage. This being true, it seems clear that the provision of the Code of 1863, § 1653 (§ 53-101), requiring that in order for there to be a valid marriage in this State there must not only be (1) parties able to contract, and (2) an actual contract, but also that there must be "consummation according to law," of necessity had reference to the requirements of the law as to license or publication of bans. As hereto-

fore pointed out, § 1658 was thereafter repealed by the legislature. While section 1653 is now embodied in our Code of 1933, § 53-101, and has the force of a statute, it can not be construed as requiring cohabitation as man and wife by parties who have entered into an informal agreement to be man and wife, before their agreement is valid. Judge Bleckley, in *Smith* v. *Smith,* supra, said that upon the repeal of § 1658, quoted above, "The common law as to informal marriages was thus restored and reinstated." It is to be observed that the provision in question reads "consummation *according to law.*" Since the common law did not require that parties, who had entered into a contract of marriage in words of the present tense, cohabit as man and wife before they were in fact legally married, and since there is no statute in this State so requiring, it does not seem that the word "consummation," as used in this provision can be said to mean cohabitation. To so construe the statute, that is, to say that it means that to constitute a valid marriage in this State there must be parties able to contract, and actual contract, and cohabitation by the parties as man and wife, would be to hold that the parties to a marriage agreement must cohabit as man and wife, whether they complied with all of the solemnities prescribed by our statutes already mentioned, or merely executed an informal agreement, in words of the present tense, to be such. As a general rule, "Statutes are not to be understood as effecting any change in the common law beyond that which is clearly indicated, either by express terms, or by necessary implication from the language used." 59 C. J. 1040; *Board of Education of Cartersville* v. *Purse,* 101 *Ga.* 422, 432 (28 S. E. 896, 41 L. R. A. 593, 65 Am. St. R. 312). As already pointed out, apparently the provision originally had reference to certain formalities prescribed by another section as being prerequisite to the validity of a marriage, which section has since been repealed by the legislature. Since no formalities are now required to be performed in the execution of a marriage contract, we think consummation is brought about either by the obtaining of a license to marry and the performance of a ceremony by a minister or other person authorized to join persons in matrimony, or by an actual agreement, in words of the present tense, to be man and wife, with the intention of thereby and thereupon assuming the relationship.

Schouler, in his work cited above, states: "To constitute a marriage, then, where there are no civil requirements—or, in other words, to constitute an informal marriage—words clearly expressing mutual consent are sufficient without other solemnities. Two forms of consent are mentioned in the books; the one, consent *per verba de praesenti,* with or without cohabitation; the other, consent *per verba de futuro,* followed by consummation. Some writers have added a third form of consent—by habit and repute; but this is, very clearly, nothing more than evidence of consummated marriage, amounting to a presumption conclusive enough for the purpose at hand." In the Dalrymple case, supra, the parties reduced their agreement to writings, which were produced by the wife, in whose possession they were left. There were no witnesses to the writings, and they contained clauses that the marriage was not to be made public for an indefinite time, which had been complied with. Though there was evidence of sexual intercourse between the parties, there was none of public cohabitation as man and wife. Lord Stowell said, in this connection: "An engagement of secrecy is perfectly consistent with the most valid, and even with the most regular marriage. It frequently exists even in them from prudential reasons; from the same motive it almost always does in private or clandestine marriages. It is only an evidence against the existence of marriage, when no such prudential reasons can be assigned for it, and where everything, arising from the very nature of marriage, calls for publication." Sharon *v.* Sharon, 75 Cal. 1 (16 Pac. 345), was an action for divorce. The plaintiff produced a contract between herself and the defendant, entered into several years before the action, wherein the parties agreed then and there to become man and wife. The contract contained a provision whereby it was agreed to keep the marriage secret for a period of two years. It appeared that pursuant to this clause the parties did not openly cohabit as man and wife, and that the plaintiff retained her maiden name. The appeal was taken from the judgment under the practice that prevailed in that State, the question presented on such appeal being whether the judgment finding in favor of the marriage was correct under the findings of fact of the trial judge. The court held that a section of the Code of that State, to the effect that "consent alone will not constitute marriage; it must be followed by a solemnization, or by a

mutual assumption of martial rights, duties, or obligations," did not change the principles of the common law, and that under such principles the clause providing for secrecy, and the fact that the parties did not publicly cohabit as man and wife, did not avoid the contract. While, on an appeal of the same case, complaining of the denial of a new trial, the ruling construing the section of the Code as not changing the common-law principles was greatly modified, the following language in the opinion we believe to be sound and material to the question here under discussion: "In the judicial decisions which speak of an open recognition of the matrimonial union, the effect of such open recognition is considered as *evidence*. The fact of marriage is one thing; the evidence by which it may be established is another. The fact of the publication of their relation, by the conduct and declaration of the parties, may go far to corroborate testimony with respect to an actual contract to marry. And so, in cases where the contract has not been directly proved, evidence that the parties cohabited together and were reputed to be husband and wife, or recognized or introduced each other as such, is admissible as tending to prove, and if sufficient proves, that they had previously entered into an agreement forthwith to become husband and wife. Yet evidence of cohabitation merely, without evidence of recognition of the relation, or repute of marriage, is not sufficient to establish an inference that there had been a mutual consent to marry, in the absence of direct evidence of such consent."

A similar case is In re Hulett's Estate, 66 Minn. 327 (69 N. W. 31). In re Peter's Estate, 73 Colo. 271 (215 Pac. 128, 33 A. L. R. 24), there was direct evidence of an agreement between the administratrix (the action being one to revoke her letters on the ground that she was not the lawful wife of deceased) and the deceased to be husband and wife. There was no evidence of general publicity in the community of the existence of the relationship, or general reputation in the community of the parties as husband and wife. It was held that the trial judge erred in holding that "habit and repute" were essential to the formation of a marriage between the parties. "Marriage is a civil contract. . . Its existence is generally established as is that of other contracts. . . The statutes provide a method of contracting marriage. That method is not exclusive. If the question be whether a marriage has been otherwise

contracted, evidence that the parties conduct themselves as husband and wife is some evidence of such a contract; evidence that they did not is some evidence against it. The habit and repute of marriage are not an essential to the legality of the relationship, but merely evidence of an essential; i. e., consent. Admitting the existence of the contract and its consummation and the absence of habit and repute, the law will uphold the marriage relation." While much that was said in the decision in Davis v. Stouffer, 132 Mo. App. 555 (112 S. W. 282), may perhaps be justly classed as obiter, and though it appears that there are subsequent decisions in that State, which, although they do not refer to or overrule it, apparently announce a contrary rule (Randazzo v. Randazzo, 236 S. W. 1061; In re Moll's Estate, 299 S. W. 127), we think that the analysis there made of the law is sound: "'When the mutual consent, in the present tense, is between competent parties, they are married.' . . What is the present assumption of the marriage status? It is not cohabitation and intercourse. . . It need be no more than a recognition that by the contract the parties, in good faith, have become and are married, for the purpose of assuming and carrying out the marriage relation. . . It is necessary that there should not only be a present contract, but it must be intended that such contract is to then and there produce the status; it must look to the 'consortium vitæ.' . . No one could say that reputation of marriage was any part of the marriage, for the simple reason that there could be no rightful reputation until after the marriage; and so cohabitation is not a part of the marriage, for it can only lawfully exist *after* the marriage—as a sequence of the marriage. . . If a contract of marriage *per verba de præsenti* is in dispute, and it appears that the parties did not actually assume the relation of husband and wife by living together, such fact is ordinarily so unreasonable, so out of keeping with natural conduct, and generally is so inconsistent with the affirmance of such contract as to perhaps destroy, in practical effect, the contract itself by the inference that no intention existed to assume the relation." In Gibson v. Gibson, 24 Neb. 394 (39 N. W. 450), an informal contract of marriage between the parties was upheld, although it appeared that it was not openly admitted at all times to all persons. See Bailey v. State, 36 Neb. 808 (55 N. W. 241).

In 2 Howard's History of Matrimonial Institutions, 183, is

quoted a statement of Chief Justice Folger of New York, in 1880, as it appeared in an article entitled, "The Marriage Celebration in the United States," 61 Atlantic, 526, as follows: "A man and woman who are competent to marry each other, without going before a minister or magistrate, without the presence of any persons as a witness, with no previous public notice given, with no form or ceremony, civil or religious, and with no record or written evidence of the act kept, and merely by words of present contract between them, may take upon the relation of husband and wife, and be bound to themselves, to the State, and to society." True, no doubt, the learned judge was bemoaning the state of the law; nevertheless this statement shows clearly what he considered the law to be. Our own court has consistently given to proof of cohabitation of parties openly as man and wife its proper place in a case involving the issue of marriage vel non. In *Drawdy* v. *Hesters*, 130 *Ga.* 161 (60 S. E. 451, 15 L. R. A. (N. S.) 190), it was said that such proof "is receivable *in evidence as a circumstance bearing upon the issue.*" See *Dillon* v. *Dillon*, supra; *Wynne* v. *State*, 17 *Ga. App.* 263 (86 S. E. 823); *Clark* v. *Cassidy*, 62 *Ga.* 408, 412 (supra); *Oliver* v. *State*, 7 *Ga. App.* 695 (67 S. E. 886); *Miller* v. *State*, 9 *Ga. App.* 827 (72 S. E. 279); *Whigby* v. *Burnham*, 135 *Ga.* 584 (69 S. E. 1114); *Hewlett* v. *Walson*, 134 *Ga.* 516 (67 S. E. 1128); *Miller* v. *Grice*, supra. In *Dale* v. *Slate*, 88 *Ga.* 552 (15 S. E. 287), it was said: "By the common law and the law of this State, a mutual agreement to be husband and wife, by parties able to contract, *followed by cohabitation*, is recognized as a valid marriage." (Italics ours.) Similar statements are to be found in many cases in this and other States. In the *Dale* case it appeared that there had been public cohabitation by the parties as man and wife. This is true of all the cases containing a similar statement that we have been able to find in this State. It is true in a great majority of the cases in other States. These cases therefore can not be considered as authority for the position that *public* cohabitation is essential to the formation of a valid informal marriage. See 33 A. L. R. 29. A few of the cases examined in this connection are: Davis v. Pryor, 112 Fed. 274; Hutchinson v. Hutchinson, 196 Ill. 432 (63 N. E. 1023); Matney v. Linn, 59 Kan. 613 (54 Pac. 668); Butterfield v. Ennis, 193 Mo. App. 638 (186 S. W. 1173); Univ. of Mich. v. McGuckin, 62 Neb. 489 (87 N. W. 180, 57 L. R. A.

917); Hughes v. Kano, 68 Okla. 203 (173 Pac. 447); Reaves v. Reaves, 15 Okla. 240 (82 Pac. 490, 2 L. R. A. (N. S.) 353); In re Sander's Estate, 67 Okla. 3 (168 Pac. 197); Pillard v. Pillard, 230 Mich. 575 (203 N. W. 402); Sims v. Sims, 122 Miss. 745 (85 So. 73); Grant v. Grant, 159 La. 535 (105 So. 611); Tryling v. Tryling, 245 Ky. 399 (53 S. W. 2d, 725). Such a statement must necessarily be taken as merely addressed to the particular proof adduced in the case under consideration. At common law the parties often may have had to rely on their public cohabitation to establish the relationship between them; for they were not competent witnesses, and accordingly could not establish the existence of a private oral agreement between themselves to be man and wife. This may have helped to foster the idea that public cohabitation and the consequent repute of marriage was an essential element of the marriage itself. Parties are now competent witnesses, and may testify to the existence of the marriage contract. *Sellers* v. *Page*, 127 *Ga.* 633 (56 S. E. 1011); *Grand Lodge Knights of Pythias* v. *Barnard*, 9 *Ga. App.* 71 (70 S. E. 678); *Davis* v. *Deloney*, 165 *Ga.* 379 (140 S. E. 759); *Southern Ry. Co.* v. *Brown*, 126 *Ga.* 1 (54 S. E. 911).

Some courts, notably those of Michigan and Texas, have said, from what we believe might be called a righteous indignation that so important and vital a contract should be so informal and uncertain, that in order to successfully prove the existence of an informal marriage there must not only be proof of a mutual agreement but of public cohabitation pursuant thereto. In People v. Spencer, 199 Mich. 395 (165 N. W. 921), it was said: "In this State a marriage is not proven by evidence only that the parties, inter se, agreed to take each other for husband and wife. To establish a non-ceremonial marriage, then there must be proof, not only of the agreement, but of the setting up of the relation of husband and wife by cohabitation. The parties must act in conformity with such agreement and live together and cohabit as husband and wife—live together in that relation." See also Lorimer v. Lorimer, 124 Mich. 631 (83 N. W. 609); Grisby v. Reib, 105 Tex. 597 (153 S. W. 1124, Ann. Cas. 1915C, 1011); White v. White, 255 Ala. 155 (142 So. 524); 33 A. L. R. 40 n. In so far as these cases may be said to hold that public cohabitation as man and wife by the parties is a necessary element of marriage, we believe them to be contrary to

common-law principles in force in this State. The fact that subsequently to the alleged contract the parties did not cohabit openly as man and wife, holding themselves out to the world as such, is of course pertinent evidence to be considered by the jury in determining whether the parties in good faith consented to become man and wife with the intent of thereby assuming that relationship. Such conduct is contrary to the normal course of things; and where the existence of the contract depends upon the credibility of witnesses, it may tend to show that there was in fact no contract, or that, even so, the parties did not intend to thereby and thereupon assume the relationship of man and wife. It is not unusual that the law will look behind the apparent intent of the parties as expressed by their agreement, to ascertain what their real intent was. *Young* v. *First National Bank,* 22 *Ga. App.* 58 (95 S. E. 381); *Durham Land Co.* v. *Kilgore,* 56 *Ga. App.* 785, 787 (194 S. E. 49). Since however, there can be a marriage without public cohabitation as man and wife, and since the failure to so do may be explained consistently with an intention on the part of the parties to assume the relationship of man and wife, it can not be said as a general proposition, even though there be proof of a contract of marriage between the parties, that such conduct conclusively demands a finding against the marriage. It is to be observed in this connection that the terms "open and public cohabitation as man and wife," and "holding themselves out to the world as man and wife," are broad generalities. In a large metropolis parties may live together, and in the immediate surrounding community conduct themselves as man and wife, while they may deny or otherwise conceal their relationship to their business associates and others. In such case it may be truly said that they did not hold themselves out to the world as man and wife, but it is apparent that their conduct would have less force in disproving their marriage than if they had completely concealed their relationship. The jury should as a general rule be left to judge of the evidence of the conduct of the parties after their alleged agreement of marriage, in connection with any explanation that appears in the evidence and all the other particular facts of the case. In the present case the plaintiff testified, without objection, that she and the deceased entered into an agreement to be man and wife. Though this evidence may have been objectionable, since the personal represen-

tative of the deceased was a defendant (*Rainey* v. *Moon,* 187 *Ga.* 712 (11), 2 S. E. 2d, 405), it was not without probative value. *Roesel* v. *Green,* 28 *Ga. App.* 694 (113 S. E. 35) ; *Brittain Co.* v. *Davis,* 174 *Ga.* 1 (161 S. E. 841) ; *Berry* v. *Brunson,* 166 *Ga.* 523 (143 S. E. 761). The evidence as a whole was in serious conflict. There was evidence that the parties openly cohabited at various addresses in the City of Atlanta, representing themselves to be man and wife. There was evidence to the contrary. The plaintiff admitted that to some extent she and the deceased actually concealed their relationship, but she explained that this was because she was a Gentile and the deceased was a Jew, and they feared that he would be ostracized by his people if their marriage became known to them. Under the charge of the judge, the jury were required to find against the marriage, if it appeared that either of the parties concealed their alleged relationship from the public generally, and did not hold themselves out to be such to the world, even though it appeared to them that the parties had entered into a bona fide agreement, in words of the present tense, to be man and wife, with the intention of thereby and thereupon assuming that relationship. Under the principles already set forth this was erroneous.

While much has been said of the evils of the common-law marriage and little has been said in defense, the function of this court is merely to declare the law as it is found to exist, and not to make the law according to notions of policy. It makes no material difference that the plaintiff's petition may be construed as alleging that the contract of marriage was entered into in Georgia, and that she testified that it was entered into in Florida. While "The validity, form, and effect of all writings or contracts are determined by the laws of the place where executed" (Code, § 102-108), and no law of Florida touching upon the validity of a private oral agreement of marriage was pleaded by either party, and while it may not be proper to presume that the common law is of force in that State upon the subject, since it was not among the thirteen original States (*Ga., Fla. & Ala. Ry. Co.* v. *Sasser,* 4 *Ga. App.* 276, 286, 61 S. E. 505), we reach the same result; since in such case the validity of the agreement must be determined in the light of applicable principles of law of force in this State, Georgia being a common-law State. *Reliance Realty Co.* v. *Mitchell,* 41 *Ga. App.*

124 (152 S. E. 295), and cit.; *Haynesworth* v. *Hall Construction Co.*, 44 *Ga. App.* 807 (163 S. E. 273).

▐ Grounds 3, 4, 5, 6, 7, and 8 of the motion for new trial complain of refusals of requests to charge. Ground 3 complains of the refusal to give the following in charge: "I charge you, gentlemen, that marriage is a civil contract and is consummated by the consent of the parties freely and voluntarily given, and the bare fact of its being clandestine and being entered into and solemnized without the usual requisite to give it publicity does not ipso facto render it void." This ground is without merit. As hereinbefore pointed out, marriage is not simply a civil contract consummated solely by consent of the parties freely and voluntarily given, but there must be also an intention on the part of the parties to thereby and thereupon assume the relationship of man and wife.

▐ These headnotes require no elaboration.

▐ In ground 8 complaint is made of the refusal to give the following charge: "It is contended by the plaintiff . . that the defendants, acting through their attorneys, procured the spiriting away of the plaintiff for the purpose of defeating her in this case; and I charge you . . that the conduct of a party to a cause may be of the highest importance in aiding you to arrive at the merits of a controversy. As to whether there has been any proof of any base, dishonorable, or criminal conduct on the part of the defendants in connection with this case is a matter solely for you to determine from the evidence in this case, and about which the court does not express or intimate any opinion." This charge was properly refused. It was argumentative, and stated no principle of law which would have materially aided the jury in arriving at a verdict. Furthermore, there was not sufficient evidence to authorize a finding that the "defendants, acting through their attorneys, procured the spiriting away of the plaintiff for the purpose of defeating her in this case." On the other hand, it appears that if the plaintiff was "spirited away" it was done by her own relatives.

▐ In ground 9 complaint is made of the refusal of the judge to allow a witness for the plaintiff to testify concerning the general reputation of plaintiff and deceased "in the neighborhood and immediate vicinity of where they both worked at 7 Decatur Street." Counsel for the defendants points out that the ground is defective in that it is not therein stated what answer was expected of the

witness, and that the judge was advised thereof. This is a meritorious criticism of the ground, for the reason that in the absence of such statement the court can not determine whether the action of the trial judge was harmful to the plaintiff. The witness might have testified to facts harmful to plaintiff's case. See *Browder-Manget Co.* v. *West End Bank,* 143 *Ga.* 736 (85 S. E. 881) ; *Farrar Lumber Co.* v. *Dalton,* 20 *Ga. App.* 138 (92 S. E. 946) ; *City of Jackson* v. *Wilson,* 146 *Ga.* 250 (91 S. E. 63) ; *Smith* v. *Smith,* 133 *Ga.* 170 (65 S. E. 414).

■ Counsel for the plaintiff objected to the reading of certain depositions of a witness for the defendant, on the ground that on cross-examination the witness refused to answer a pertinent and material question. Whether this would be ground for suppressing the depositions of the witness, where it does not appear that counsel for plaintiff insisted when the depositions were taken that the question be answered, or made any attempt to have the commissioner compel the witness to answer, need not be decided. It is sufficient to say, without further extending this opinion, that by the question it was sought to elicit irrelevant matter, and for this reason the failure of the witness to answer was not harmful error.

■ Since we have determined that a new trial must be granted, we consider the defendants' demurrers. The petition was not subject to general demurrer. The allegations, when taken as true, show the existence of a valid informal marriage between the plaintiff and the deceased, under the principles set forth in division 1, supra, and when properly construed do not show that the relationship between plaintiff and deceased was at any time illicit. While a court of equity will not ordinarily interfere with the regular administration of estates, it will do so upon the application of one interested in the estate, where there is danger of loss or other injury to such interest, and where the applicant does not have a full and adequate remedy at law. Code, § 37-403; *Walker* v. *Morris,* 14 *Ga.* 323; *Crawford* v. *Crawford,* 139 *Ga.* 535 (77 S. E. 826) ; *Thompson* v. *Orser,* 105 *Ga.* 482 (30 S. E. 626). Taking the allegations of the petition as true, she is the sole heir of the deceased and as such entitled to his entire estate; the defendants, knowing that the plaintiff and the deceased were married, falsely represented to the ordinary that they were the next of kin of the deceased, and procured the appointment of Perle Sicro as admin-

istratrix of his estate; the administratrix is insolvent, the bond given by her is grossly inadequate, and through her management and control the estate is being wasted and depleted, with no corresponding reduction of debts due by said estate. It is clear that since the plaintiff must first establish herself as the lawful wife of the deceased, and since it appears that the estate is being wasted and there is danger of loss and injury to her interest in the estate, a court of equity can more adequately and completely protect her rights than could a court of law. Equity has jurisdiction to set aside a judgment granting letters of administration, where such judgment was obtained by fraud. *McArthur* v. *Matthewson*, 67 *Ga.* 134; *Wallace* v. *Walker*, 37 *Ga.* 265 (92 Am. D. 70); *Neal* v. *Boykin*, 129 *Ga.* 676 (59 S. E. 912, 121 Am. St. R. 237); *Powell* v. *McKinney*, 151 *Ga.* 803 (108 S. E. 231); *Wash* v. *Wash*, 145 *Ga.* 405 (89 S. E. 364); *Bowers* v. *Dolen*, 187 *Ga.* 653 (1 S. E. 2d, 734). The plaintiff alleged that the defendants conspired to and did perpetrate a fraud upon the ordinary in procuring letters of administration, by representing to him that they were the next of kin of deceased, and concealing from him the fact that the plaintiff was the surviving widow of the deceased. It does not appear that the plaintiff was served with the proceeding. On the contrary it sufficiently appears that she knew nothing about it. Therefore she was not estopped from attacking the judgment of the ordinary. See *McCowen* v. *Flanders*, 155 *Ga.* 701 (118 S. E. 351); *Medlock* v. *Merritt*, 102 *Ga.* 212 (29 S. E. 185); *Powell* v. *McKinney*, supra. In *Wallace* v. *Wallace*, 142 *Ga.* 408 (83 S. E. 113), it was said: "A judgment of the court of ordinary, granting permanent letters of administration to one who is neither next of kin nor a creditor, nor otherwise entitled to administration under the provisions of the Civil Code, § 3943, may be set aside in a direct proceeding in equity at the instance of heirs at law, on the ground that it was falsely and fraudulently represented in the application for letters of administration that the applicant was next of kin to the decedent."

We do not deem that an elaboration of the remaining headnotes is necessary. For reasons stated in division 1 of this opinion, a new trial must be granted.

*Judgment reversed on the main bill of exceptions; affirmed on the cross-bill. All the Justices concur, except Atkinson, P. J., and Duckworth, J., who dissent.*

ATKINSON, Presiding Justice. I dissent especially from the statement of principle as pronounced in the first division of the decision. The pronouncement is in effect that a bald agreement between a man and woman, under no legal disability, presently to be husband and wife, made in good faith and intended by them to create the relationship of husband and wife, is sufficient without more to constitute a valid marriage. This pronouncement fails to give effect to the Code, § 53-101 (3), viz.: "To constitute a valid marriage in this State there must be—1. Parties able to contract. 2. An actual contract. 3. Consummation according to law." This section originated by adoption of the Code of 1863, in which it appeared as § 1653. It was carried into the subsequent Codes of 1895, 1910, and 1933, all having been adopted by legislative enactment. It has the binding effect of a statute. *Central of Georgia Railway Co.* v. *State,* 104 *Ga.* 831 (2) (31 S. E. 531, 42 L. R. A. 518). It was carried in the Code of 1882 as § 1698. That Code was not adopted by the legislature, but was in vogue at the time of the decision of *Smith* v. *Smith,* 84 *Ga.* 440, 442 (supra), rendered in 1889, involving a ceremonial marriage between a boy and girl who, not having attained the prescribed age, entered a ceremonial marriage that was not valid, and lived together as husband and wife. In the opinion in that case the court, through Chief Justice Bleckley, quoted and discussed that section in connection with other sections of the Code, certain decisions of this court, including *Askew* v. *Dupree,* 30 *Ga.* 173 (supra), that will be mentioned later, and the common law. Following this discussion it was said: "The common law as to informal marriages was thus restored and reinstated. It follows that a lawful marriage may be contracted between parties prematurely married, if at any time after arriving at the age of consent they so agree, and their marriage may become complete without the observance of any prescribed forms. If Smith and wife, after he had become seventeen years of age, had actually agreed to live together as husband and wife, and had continued to cohabit accordingly, a true matrimonial relation would have been established between them. If cohabitation based on express agreement would have had this effect, why should not cohabitation based on acquiescence in their premature marriage have a like effect? Cohabitation referable to that marriage would seem to be as free from moral impurity, and as whole-

some to private conscience and public order and decorum, as if it followed upon a new affirmative agreement consciously entered into for the distinct purpose of inaugurating marriage. Indeed, if persons who unite matrimonially whilst too young to enter wedlock are to remain together at all after coming to the full age of discretion, it would seem that the more delicate and decorus way to do it, if they can be allowed to omit public forms, is to recognize the past as not abruptly severed from the present and the future by the wide chasm which divides illicit intercourse from matrimonial union. The making of a new agreement would necessarily bring into consciousness a suggestion of something gross and repulsive in the past cohabitation. For a young husband, on consummating his seventeenth year, to propose marriage to the wife with whom he had lived for a year or two previously as a wife, might be necessary under a system of law such as that which the Code attempted to introduce; but we can not think it necessary under the old system which the legislature designed to reinstate, and did reinstate, by the repealing act of 1863."

The philosophy of this deliverance has been consistently followed, the latest expression being found in the decision delivered through Mr. Justice Jenkins in *Addison* v. *Addison,* 186 *Ga.* 155 (197 S. E. 232), where it was held: "While it is the rule that cohabitation, illicit in its inception, will be presumed to have so continued throughout the period of cohabitation, yet if, after the disability of the parties has been removed by lapse of time or otherwise, the cohabitation is continued, and the parties thereafter hold themselves out as man and wife, if the original illegal cohabitation was had in the absence of an attempted ceremonial marriage, a new and valid agreement of marriage will be presumed to have been entered upon, in the absence of anything appearing to the contrary; and if such illegal original cohabitation was in pursuance of an abortive ceremonial marriage, the continued cohabitation as man and wife after the disabilities have been removed will, in the absence of anything appearing to the contrary, cause the original declaration of intent to be treated as continuing. *Foster* v. *Foster,* 178 *Ga.* 791 (3) (174 S. E. 532) ; *Drawdy* v. *Hesters,* 130 *Ga.* 161 (4-6) (60 S. E. 451, 15 L. R. A. (N. S.) 190) ; *Powers* v. *Powers,* 138 *Ga.* 65 (74 S. E. 759) ; *Luke* v. *Hill,* 137 *Ga.* 159, 161 (73 S. E. 345, 38 L. R. A. (N. S.) 559) ; *Smith* v. *Smith,* 84 *Ga.* 440, 445,

451 (11 S. E. 496, 8 L. R. A. 362) ; *Smith* v. *Reed,* 145 *Ga.* 724 (89 S. E. 815, L. R. A. 1917A, 492) ; *Hamilton* v. *Bell,* 161 *Ga.* 739 (3) (132 S. E. 83) ; *Heflinger* v. *Heflinger,* 161 *Ga.* 867 (132 S. E. 85)." The decision in *Askew* v. *Dupree,* 30 *Ga.* 173 (supra), was rendered at the March term, 1860, before the Code of 1863 went into effect. That was a case where James F. Dupree and his wife, Uriah E. Dupree, instituted suit against Uriah Askew as guardian for Mrs. Dupree, for an accounting and to recover her distributive share in the estate of her deceased father in the hands of defendant as administrator. The defendant pleaded in abatement, that complainants were not man and wife; that they were not lawfully married; that the pretended marriage between them was solemnized by a named person as a minister of the Gospel who in fact had been expelled from the ministry, by means whereof he was disqualified to perform the marriage ceremony. A demurrer to the plea was sustained, and the plaintiff excepted. In the opinion this court through Lumpkin, J., adopted an opinion of the trial judge, which was quoted at length, being an exposition of the common law in respect to marriage. Judge Lumpkin added: "The conclusions to be deduced from the whole matter are these: That marriage is founded in the law of nature, and is anterior to all human law; that in society it is a civil contract; that if the contract is *per verba de presenti*—that is, I take you to be my wife, and I take you to be my husband,—though it be not consummated by cohabitation, or if it be made *per verba de futuro,* and be consummated, it amounts to a valid marriage, in the absence of all municipal regulations to the contrary; and that notwithstanding there be statutes directing a license to issue, as in this State, and inflicting a penalty on any minister or magistrate who shall unite the parties in wedlock, without such license, yet, in the absence of any positive enactment, declaring that all marriages not celebrated in the prescribed form, shall be void; a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment, is still a valid marriage."

As stated above this decision was before adoption of the Code, when there was no express statute making one of the essentials of a valid marriage "consummation according to law," as afterwards was provided by law. Code of 1933, § 53-101 (3). In that case the

plaintiffs by the allegations of their bill held themselves out to the court as husband and wife; and had there been such statute, it is to be inferred in view of the quoted language of Judge Lumpkin, "in the absence of all municipal regulations to the contrary," that he would not have said: "that if the contract is *per verba de presenti*—that is, I take you to be my wife, and I take you to be my husband,—though it be not consummated by cohabitation, or if it be made *per verba de futuro,* and be consummated, it amounts to a valid marriage;" or that he would have said "a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment [relating to marriage license], is still a valid marriage." Judge Lumpkin was talking about marriages under the common law, and used the language, "though it be not consummated by cohabitation." What he meant by consummation was, to use his language, "by cohabitation" which is the natural culminating act of marriage. With that deliverance fresh in mind, the legislature, perceiving the far-reaching effect and dangers of the common law as expounded, proceeded, by adoption of the Code of 1863—not ignoring the whole common law relating to marriage, but recognizing its existence—to safeguard it (to use the language of Judge Lumpkin) by "municipal regulations." To accomplish that result the legislature adopted the provision of the Code of 1863 (Code of 1933, § 53-101), and made one of the essentials of a valid marriage in this State "consummation according to law." That provision was suggested by the substance of the opinion of Judge Lumpkin, and used almost his exact language, "consummated." Consummation as used in the statute (again employing the language of Judge Lumpkin) means "by cohabitation." "According to law" as used in the statute had reference to the common law as expounded by that decision, and recognized by the legislature as then existing, but which on that feature was intended to be "regulated." In the light of the history of the Code section, its language and substance, it can not be said that it refers only to ceremonial marriages, or that it does not apply to marriages at common law. In *Smith* v. *Smith,* 84 *Ga.* 440 (supra), the court viewed the case in the light of the facts of that case and all the statutes on the subject, applied the Code (now § 53-101), and sustained the premature ceremonial marriage, not on the ground of a valid ceremonial marriage, but on the basis of

that attempted marriage and the additional fact of the parties living together as husband and wife after the disabilities of the parties had been removed. This thread of thought is seen in all of the cases which have been cited above, rendered since adoption of the Code. In them the additional fact of cohabitation is treated as essential, if not the main factor in establishing in this State a common-law marriage. Not one of the decisions has held that a mere agreement—unattended by cohabitation as husband and wife—between a man and woman under no legal disability, presently to be husband and wife, made in good faith and intended by them to create the relation of husband and wife, is sufficient without more to constitute a valid marriage. After nearly one hundred years it is now proposed to go back, and apply the defective common law which the Code professed to correct. Such a ruling would be contrary to the legislative intent reflected in the statute, and opposed to the principles ruled in all the decisions of this court. It would go to the integrity of the marital relations, the foundation of society, and all that flows from that relation. Under such ruling a man being at one place in this State and a woman being at another and distant place, who had never seen each other, could by private exchange of letters or telegrams, or even by telephone or radio conversation, by mere agreement effect a valid marriage, thereby creating the relation of husband and wife though they might never afterwards see each other or cohabit as man and wife. It would enable a man or woman under a spurious claim of marriage to evade the statutes of frauds, and in virtue of supposed marital relations, by force of the inheritance laws or the right of dower or the statutory right to a year's support, acquire title to property that ordinarily could devolve only by deed or will. And it would enable either under spurious claim of marriage to deprive the other of the right to marry. Neither personal nor property rights of either would be safe. Even creditors might be injuriously affected, and the State hampered in the enforcement of its penal laws. The Code, § 53-101 (3), should be interpreted in the light of the old law (as expounded in *Askew* v. *Dupree*, supra), the mischief, and the remedy that was afforded by adoption of the Code of 1863 (1933, § 53-101). In connection with what is said above, see 38 C. J. 1316, §§ 89-91; *Dale* v. *State*, 88 *Ga.* 552, 556 (15 S. E. 287); *Chance* v. *Chance*, 60 *Ga. App.* 889 (5 S. E. 2d, 399). *Justice Duckworth concurs in this dissenting opinion.*